(No. 34882.—

THE COUNTY OF COOK, Appellee, *vs.* VULCAN MATERIALS COMPANY *et al.*, Appellants.

*Opinion filed March 20, 1959—Rehearing denied May 19, 1959.*

BRISTOW, J., dissenting.

ALBERT E. JENNER, JR., CHARLES J. O'LAUGHLIN, and THOMAS W. MCNAMARA, all of Chicago, (THOMPSON,

RAYMOND, MAYER, JENNER & BLOOMSTEIN, of counsel,)
for appellants.

BENJAMIN S. ADAMOWSKI, State's Attorney, and FRANK
S. RIGHEIMER, both of Chicago, (BLAIR VARNES, and
FRANK S. RIGHEIMER, JR., of counsel,) for appellee.

Mr. JUSTICE HOUSE delivered the opinion of the court:

The petitioner, the county of Cook, filed this suit to
condemn a 12-acre strip through 65 acres of land owned
by Vulcan Materials Company and occupied by it and the
other respondents for stone quarrying and asphalt manu-
facturing purposes. It proposed to construct the Congress
Street Expressway over such strip. Respondents appeal
from the judgment entered upon the jury verdict of
$243,000 as compensation for land taken and $382,000 for
damages to land not taken. A freehold is involved.

The property in question is located in the village of
Hillside about 18 miles southwest of Chicago and is inter-
sected by Harrison Street just west of Mannheim Road.
Consumers Division of Vulcan owns 39 acres immediately
north and 26 acres south of Harrison. A quarry pit occu-
pies the northwest 21 acres of the 39-acre tract plus 6.7
acres immediately west thereof on an 8-acre tract leased for
quarrying from the Holland family. In the southeast 2
acres of the remainder of the 39-acre tract, a small plot is
leased to Allied Asphalt Paving Company, upon which is
located an asphalt plant, and the remaining 16 acres are
occupied by limestone processing facilities, ready-mix con-
crete aggregate plant, auxiliary buildings and improvements,
railroad service and switching tracks, and stock piles of
sand, gravel and processed stone. Vulcan maintains an
office building, garage, machine shop and various low-value
wooden buildings and dwellings upon the northerly part of
26 acres south of Harrison. The northerly 1½ acres thereof
is leased to Seneca Petroleum Co., which maintains a second

asphalt plant thereon. The remaining southerly 20 acres had been occupied by Lewistown Pipe Company, as a concrete pipe plant where various sizes of sewer pipe were poured and stored, but was vacated prior to the trial of this cause. All of the lessees were required to and did purchase as raw materials for their asphalt and pipe the products processed by Vulcan.

The Congress Street Expressway roughly parallels Harrison Street at this point and requires the northerly 10 acres of Vulcan's south 26 acres, together with 2 acres just north of Harrison on the east end of the quarry property for the construction of the west half of a cloverleaf at Mannheim Road. The expressway is a limited access highway of two traffic lanes separated by a median strip with service drives on either side. It will be about 17 feet below existing ground level.

Respondents produced expert testimony on their theory of the highest and best use, geological data and land values. They also made proof of location, thickness, depth below the surface, quantity, quality, and quarryability of this and other limestone deposits, quarry methods and their problems. The evidence ranged through limestone crushing and processing, ready-mix concrete aggregate and asphalt plant operation; land, plant and machinery values; zoning laws, and much technical evidence including plats, maps, charts and computations.

Proof was made by respondents to support their contention that the Hillside quarry is so located with reference to its market and competition as to make it very valuable, that it has a good stone deposit, that no quarries are located in the Chicago area north of it, and that since transportation costs dictates the price of a bulk commodity such as limestone, the location enhanced the value of the whole quarry. They concede that limestone deposits abound in the area, but at least one expert witness testified that in his opinion another large pit would never be opened in the area because

of zoning restrictions. They further offered proof that the south 26 acres was their reserve of limestone for the future, that they had feasible plans for quarrying it, but that if the north ten acres be taken the balance could not be economically quarried. Their theory is that the award for land taken was inadequate, inconsistent and against the manifest weight of the competent evidence in the record.

Petitioner produced evidence of the widespread location of limestone deposits in the area, contended that the 26 acres south of Harrison could not be economically operated because of its location and overburden and that the quarry company had no intention of quarrying it until plans were made for the expressway. Sales of tracts in the area said to be comparable were proved, as were sales by predecessors and part owners of the predecessor companies. The sale value of such other tracts were in line with petitioner's witnesses's values placed upon respondents' property. Petitioner's theory is that the verdict of the jury was well within the range of the testimony and sustained by the clear weight of the evidence.

Petitioner's valuation witnesses, Lester Porter and William Kaplan, testified that the highest and best use of the 26 acres was industrial, and fixed the value of lands taken at $239,500 and $237,500, respectively, with no damages to the remainder not taken. They expressed no opinion as to the value of the whole 65 acres before the taking nor the value of the remainder after the taking.

Respondents, on the other hand, contend that the whole 65 acres is a going quarrying unit and that the taking of the 12 acres would so separate their pit and plants from the segment left to the south as to make it uneconomical to quarry the stone therefrom. Their four valuation witnesses testified that the highest and best use for all of the 26 acres was quarrying. Such witnesses fixed the value of land taken from $1,466,435 to $1,858,500 and damages to land not taken from $1.164,750 to $2,216,700.

The award is within the range of the evidence, although the valuation evidence is widely divergent and conflicting. Under such circumstances, where the jury views the premises, the rule is that a verdict will not be disturbed unless there has been a clear and palpable mistake or the verdict was the result of passion or prejudice. *County of Cook* v. *Colonial Oil Corporation,* 15 Ill.2d 67; *Dept. of Public Works and Buildings* v. *Lambert,* 411 Ill. 183.

Respondents contend, however, that petitioner has not sustained the original and basic burden imposed upon it of proving the fair cash market value of the land. Before going into this problem, which necessarily entails an extended analysis of the testimony of petitioner's valuation witnesses, we will consider the charge of serious prejudicial error in the admission and use of a balance sheet.

Petitioner, on rebuttal, introduced in evidence a consolidated balance sheet of Consumers Company as of December 31, 1953, and July 1, 1954, which was part of a voluminous proxy statement filed with the Securities and Exchange Commission in connection with a proposed merger of Consumers with two other corporations. The merger was consummated in 1954 and the organization became Union Chemical and Material Corporation. (The name was changed to Vulcan Materials Company after arguments on this appeal and we have granted a motion to substitute the new name in the briefs and in this opinion.) The trial court admitted that portion of the balance sheet which set out property, plant and equipment values, together with footnote 3 attached, but the whole balance sheet went to the jury. Footnote 3 was specifically made an integral part of the balance sheet. It disclosed that values were based on an appraisal of March 1, 1937, plus subsequent additions at cost, less depreciation on a straight-line basis at rates varying from 2⅚ per cent to 20 per cent per annum, and less depletion at rates designed to amortize the recorded value of stone deposits on the basis of recoverable yardage.

The balance sheet showed such physical assets to be valued at $7,534,389 minus depreciation and depletion reserves of $3,013,007, leaving a net value of $4,521,382. Included in the gross value before setting up reserves was land, stone and gravel deposits in Illinois, Indiana and Wisconsin at $664,565. Petitioner brought out on cross-examination that the stone acreage at Hillside was about one tenth of the stone land owned by Consumers. The balance sheet was offered in evidence as an admission against interest to show that the value of the property, including stone in place, submitted by Consumers to the SEC was at variance with the valuation of respondents' witnesses.

The background of the balance sheet is an interesting one. It commenced with a valuation on March 1, 1937, allegedly based on an appraisal made at that time. The record discloses that Consumers was in financial difficulty and that the earlier statement was for use in a bankruptcy reorganization of the company. The footnote plainly indicates that the balance sheet was the result of two different methods. First, property acquired prior to March 1, 1937, was presumably "appraised," that is, the then value was fixed without regard to original cost minus depreciation, and second, property acquired thereafter was valued by taking the cost of acquisition and setting up reserves for depreciation and depletion proportionate to the accountants' estimate of each item's useful life. We thus have neither "fish" nor "fowl." The earlier acquired property bore an appraised value and the after required items were taken at book value.

It is a well known fact that there may be a vast difference between book value and actual or fair cash market value. Book value normally represents cost less reserves for depreciation and depletion. The amount of the reserves is often dictated by expediency. In fact, the government has at times, in order to encourage certain types of construc-

tion, permitted accelerated depreciation. Taxpayers usually take advantage of the faster depreciation to save taxes in large income years and to keep up their cash reserves. Banks and financial institutions often charge their banking house and fixtures down rapidly and, in many cases, charge them off completely in order to improve their statements. Each of these and similar methods tend to reduce the book value far below actual value. Furthermore, book value does not usually reflect fluctuations in marketability caused either by inflationary-deflationary trends, nor going concern against salvage values of a nongoing business. See: Practicing Law Institute General Practice Monograph (Revised to March 31, 1953), pp. 57-58; Illinois Law Review, vol. 36, p. 545 *et seq.*

Petitioner cites a number of cases in an effort to sustain its position that the balance sheet was properly received in evidence.

*Chicago Smelting and Refining Co.* v. *Sullivan,* 246 Ill. App. 538, involved the question of whether the plaintiff corporation had assumed the debts of a partnership and thereby had given the defendant a setoff. The corporate minutes showed assumption of all liabilities "shown on the accompanying balance sheet." Objection was made that the accuracy of the balance sheet was not established by the person who made it. The Appellate Court held that it should have been admitted because it was in the nature of an admission against interest. The point in that case was whether the balance sheet introduced was, in fact, the one referred to in the minutes. Obviously it was admissable if properly identified, since it reflected the assumption point in issue. Here, the issue is fair cash market value and the balance sheet does not purport to show market value.

The only other Illinois case on the subject, *Springer* v. *City of Chicago,* 135 Ill. 552, is not in point. It held that the offer of an owner to sell at a certain price, while not

conclusive evidence of value, was competent evidence against him as an admission. Here, there was no offer to sell all or any part of the assets at the balance sheet value.

In *Graham Farm Land Company* v. *Commonwealth*, 363 Pa. 571, 70 A.2d 219, a capital stock tax report of the corporation was held to be relevant to show its own estimate of value in an eminent domain proceeding. The taxing statute required the report to contain actual value of property, and the Pennsylvania court held that there can be only one "actual value" and the report should have gone to the jury as a pertinent estimate of the taxpayer's valuation. We are not inclined to go so far, but in any event, the balance sheet in question here shows on its face that it does not purport to represent fair cash market value.

Cases from other jurisdictions, which permit the introduction of the property owner's returns for property tax assessments in eminent domain proceedings for impeachment purposes, are cited by petitioner as analogous. We have held that statements of value for tax assessment purposes are inadmissable in condemnation proceedings on the issue of market value for the reason that they are not and do not purport to be statements of market value, (*City of Chicago* v. *Harrison-Halsted Building Corp.* 11 Ill.2d 431,) and are not persuaded that a contrary rule should be adopted.

The balance sheet was based in part on a previous appraisal made more than 17 years prior to the date of the balance sheet and 18 years prior to the filing of the petition in this cause. The previous appraisal was not produced nor was the method used in arriving at it explained. The balance sheet did not necessarily indicate the fair cash market value, nor did it purport to do so. It was based in part on book value, which did not reflect the decided inflationary trend between 1937 and 1954, nor the probable increase in the company's value by virtue of the location of its plant and large quantity of stone in a fast growing area requiring

its products and in which quarrying is permitted under ever more restrictive zoning regulations.

We are of the opinion that the balance sheet was not relevant to the issue of fair cash market value and should not have been admitted in evidence. This presents the question of whether admission of the balance sheet was of such a prejudicial nature as to warrant a reversal. The answer partially rests in the use to which the exhibit was put and its probable effect on the verdict of the jury.

Petitioner's counsel cross-examined respondents' witnesses extensively about the balance sheet. They were asked whether they had examined it to determine the amount at which the properties were carried on the books, how much the properties had depreciated and the like. This was followed up by argument to the effect that "if these balance sheets were wrong, they had an opportunity to come in here and tell you what the balance sheets were." Other statements were made which tended to convey to the jury that either the balance sheet on the one hand or respondents' valuation testimony on the other was false. Under such circumstances it seems obvious that there was prejudicial error and that respondents are entitled to a new trial.

Respondents not only objected to the above argument and to other phases of the argument of petitioner's counsel, but challenged their arguments *in toto* and moved for the withdrawal of a juror and a mistrial. We realize the inadequacy of quoting statements out of context to convey the gist of an argument, and will mention only a few. Respondents and their counsel were accused of a conspiracy "to stick" the county, that they presented a "built up" case and that they "imported witnesses" as a means of perpetrating a fraud on the court and jury. Witnesses were ridiculed and belittled in such language as "perpetual testifier," "sort of goat," "quarry boy," "the gentleman with the Florida tan," "me too boys," "some university fellow," a "Judas Iscariot," "the local boys" and more of the same import. As

we recently pointed out in *Department of Public Works and Buildings* v. *Anastoplo*, 14 Ill.2d 216, we do not approve nor condone this type of argument.

The remaining errors assigned for reversal are alleged irregularities in the conduct of the trial of this cause and can be met when the case is retried.

For the reasons heretofore assigned, the judgment of the superior court of Cook County is reversed and the cause is remanded.

*Reversed and remanded.*

Mr. JUSTICE BRISTOW, dissenting.