402 So.2d 507 (1981)
OCEANIC INTERNATIONAL CORPORATION, a Washington, D.C., Corporation, Appellant,
v.
LANTANA BOATYARD, a Florida Corporation, Appellee.
No. 80-1051.
District Court of Appeal of Florida, Fourth District.
August 12, 1981.
Rehearing Denied September 9, 1981.
*508 John L. Avery, Jr., West Palm Beach, for appellant.
David H. Baker, of Alley, Maass, Rogers, Lindsay & Chauncey, Palm Beach, for appellee.
HERSEY, Judge.
This was an action for commissions alleged to be due appellant for procuring a purchaser for boats to be constructed by appellee. The trial court found that appellant had been paid in full and entered the final judgment from which this appeal is taken.
The correctness of the judgment depends upon factual findings made by the trial court. Only if those findings are unsupportable do questions of law arise. Consequently we outline first the uncontroverted facts.
On October 1, 1976, Delex Incorporated entered into a marketing agreement with appellee, Lantana Boatyard, Inc. This written contract was for a term of one year and included the following provisions material to the issues raised in this lawsuit:
1. For marketing services and expenses related to sales both foreign and U.S. Government, DI [Delex Incorporated] will be paid by Lantana Boatyard, Inc. a monthly retainer of $1,000.00.
2. For marketing services and expenses related to sales both foreign and U.S. Government, DI will be paid 5% of the F.O.B. Lantana Boatyard, Inc. price, exclusive of sales tax for sales procured by DI or re-orders of the same except where otherwise specifically agreed... .
... .
4. DI agrees not to represent directly or indirectly a competitive line, and shall adhere to, cooperate with, and comply with manufacturer's sales policies and programs. All orders submitted to DI shall be subject to final acceptance or rejection by LBY.
The contract was negotiated on behalf of Delex by Michael Infante who was a one-third *509 owner and vice-president (ultimately president) of that corporation. It was Infante who was actually to undertake marketing of vessels for Lantana and he did in fact accomplish sales of a number of bridge erection boats to the government of Argentina.
Infante introduced the Lantana people to an individual named Dell'Orto who acted as a go-between with the Argentinian government. Through him there were authenticated sales of thirty-three bridge erection boats: an original order for ten boats with an option for six more (which eventually was taken up for a total of sixteen) at $98,000 per boat; a second order for ten boats at $116,750 per boat; and a third order for seven at $146,923 per boat. Additional orders of the same type of craft were contemplated by all parties involved, at least to the extent of an additional order for seven boats.
Before concluding the recitation of undisputed facts it is necessary to treat two areas in which the facts and the legal effect of those facts are disputed, in order to understand the significance of subsequent events.
Just prior to submission of the first bid to the Argentinian government for bridge erection boats, there was at least one conference to discuss commissions that would have to be taken into account in computing the bid. Michael Infante was present for Delex, Dell'Orto represented himself and Elliott Donnelly, president of Lantana Boatyard, Inc., represented that corporation. It is undisputed that Dell'Orto, who had a written contract which entitled him to a seventeen percent commission, agreed to reduce this to fifteen percent. It was Donnelly's testimony that Infante agreed to accept three thousand dollars per boat in lieu of the five percent commission called for in the Delex marketing agreement. Infante denies any such modification of the written contract. The reason given by Donnelly for the reductions was to permit his corporation to make a bid that would be competitive. When the initial figures were eventually revised and a firm bid submitted, Dell'Orto actually received more money from his fifteen percent than he would have received under the original pricing with his seventeen percent commission intact. On the second order for ten boats Dell'Orto was paid commissions of twenty-two percent. On the third order of seven boats, thirty-five percent was paid to Dell'Orto. Interestingly, not only did his percentage increase tremendously, but the price of the vessels increased from $98,000 to $116,750 to $146,923 on the respective orders. Thus, Dell'Orto was paid a commission of $14,700 on the first boat sold and $51,423 on the last boat sold.
Delex, on the other hand, would have earned $4,900 and $7,346 respectively but for the purported modification to a set $3,000 per vessel.
We note again that the reason for the alleged modification was to enable Lantana to submit a competitive bid. It is a little difficult to accept at face value that the success or failure of the bid depended on a $1,900 per boat differential in the Delex commission in view of the Dell'Orto commissions. We also note that appellee, Lantana, has billed roughly $4,200,000 for bridge erection boats as a direct result of the initial contact made by and through Infante as the controlling principal of Delex.
The second point of contention involves the demise of Delex and the substitution of appellant, Oceanic, as marketing representative of Lantana. The extent and effect of that attempted substitution is strenuously contested in the record.
Subsequent to finalization of the initial order for sixteen boats, Delex became involved in a potential guilt by association situation unrelated to the boat sales. In order to avoid possible repercussions Infante approached Donnelly with the suggestion that Delex be phased out as marketing representative and another corporation controlled by Infante, appellant, Oceanic, be substituted in its place. Infante insists that what was intended and what was accomplished was an assignment of the entire interest of Delex in the marketing agreement *510 to Oceanic. Donnelly, on the other hand, testified that it was his intention to agree to pay to Infante, through Oceanic, only the commission remaining due and owing on the first order of boats. In Donnelly's view the total commission was $48,000, some of which had been paid. Infante contends that the give percent was due from the initial order, together with commissions for subsequent sales by virtue of assignment of the contract to Oceanic.
A letter of termination was written to Delex in 1977. Infante testified that termination was effected at his suggestion to accomplish the substitution of Oceanic. A new, but substantially identical, marketing agreement was submitted by Oceanic to Lantana for signature. It was never signed.
Lantana, apparently on the advice of counsel, insisted upon a general release from Delex before it would agree to pay Oceanic. Such a release running to Infante and Lantana was obtained from Delex by Infante and submitted to Lantana.
Thereafter Lantana made monthly retainer payments, actually advances against commissions, directly to Oceanic.
The point in dispute is whether Oceanic succeeded to the entire interest of Delex under the original marketing agreement, including entitlement to commissions for future orders from the same customer for the same type of vessel, or whether, upon receipt of an amount which, when added to sums previously received by Delex, totalled $48,000, the liability of Lantana to Oceanic was fully satisfied.
The final major controversy involves that portion of the original marketing agreement which prohibited Delex from representing "... directly or indirectly a competitive line... ." It is appellee's position that appellant violated that covenant so that, even if otherwise entitled to commissions on sales after the first order, that entitlement was forfeited by virtue of the violation.
In order to complete the picture, mention of certain additional undisputed facts is necessary.
There is no serious dispute concerning the payment by Lantana to Delex and Oceanic of the sum of $48,000. The books of Lantana, however, apparently reflect $1,000 still unpaid.
On April 28, 1978, Lantana directed a letter of termination to Oceanic "... to terminate the marketing agreement with your firm." Payment of commissions earned was to be made, but "... our current arrangement for your services will terminate June 1, 1978."
Statements of account were rendered to Oceanic by Lantana on at least two occasions in 1978 showing total commissions due of $48,000. These were not promptly objected to by Oceanic.
On these facts the trial court entered a final judgment containing the following conclusions pertinent to the issues on appeal:
5. At no time did DELEX INCORPORATED ever assign to OCEANIC INTERNATIONAL its rights under the October 1, 1976, agreement with LANTANA BOATYARD, INC.
6. At no time did Defendant, LANTANA BOATYARD, INC., ever enter into a written agreement with OCEANIC INTERNATIONAL CORPORATION for the marketing services and sale of boats.
7. Following the termination of the agreement with DELEX INCORPORATED, LANTANA BOATYARD, INC., received an order from the Argentine government for 16 boats in November, 1977.
8. LANTANA BOATYARD, INC., through a check dated February 23, 1978, in the amount of $4,000.00 paid OCEANIC INTERNATIONAL CORP. monthly retainer payments due it for the months October, 1977, through January, 1978. Contained in that letter was a statement of account showing total commissions due of $48,000.00 for the sale of boats. Another check was sent OCEANIC INTERNATIONAL CORP. by LANTANA BOATYARD, INC., on May 10, 1978, in the amount of $4,000.00 for monthly retainer payments for the months February, *511 1978, through May, 1978. On May 2, 1978, LANTANA BOATYARD, INC., sent OCEANIC INTERNATIONAL a check for $5,500.00 for commissions due and further sent a statement as of that date showing the total amount of commissions due on future shipments of the boats sold to the Argentine government. LANTANA BOATYARD, INC., later issued a check dated September 1, 1978, in the amount of $18,000.00 to OCEANIC INTERNATIONAL for payments due as commissions for the sale of boats. Parties stipulated that a total amount of $48,000.00 has been paid by LANTANA BOATYARD, INC., to OCEANIC INTERNATIONAL CORPORATION.
9. Plaintiff has failed to prove the existence of any agreement entitling it to more than $48,000.00, and this Court finds that the Plaintiff has been paid in full all sums due and owing to it.
For the sake of clarity we restate the issues that, in our view, are determinative of this appeal. The first is whether there was a modification of the written agreement reducing commissions to $3,000 per boat. The second is whether there was an assignment of the Delex interest in the written contract to Oceanic. We do not reach the third issue involving violation of the covenant not to compete, since it was never reached and consequently, was never ruled on by the trial court, although we will refer to this issue in another context.
It is the function of the trial court to evaluate and weigh the testimony and other evidence in order to arrive at findings of fact to which the rules of law are then applied. The appellate court has no opportunity to observe the witnesses and thereby to judge their credibility. For this and other good reasons certain rules of review have been formulated that define and limit the appellate function. In Shaw v. Shaw, 334 So.2d 13 (Fla. 1976) the court succinctly deals with those limitations in the following language:
It is not the function of the appellate court to substitute its judgment for that of the trial court through re-evaluation of the testimony and evidence from the record on appeal before it. The test, as pointed out in Westerman, supra, is whether the judgment of the trial court is supported by competent evidence. Subject to the appellate court's right to reject "inherently incredible and improbable testimony or evidence," it is not the prerogative of an appellate court, upon a de novo consideration of the record, to substitute its judgment for that of the trial court. Id. at 16. (Footnote omitted).
A more exhaustive and extremely illuminating statement of the principles involved is set out by the court in In re Estate of Donner, 364 So.2d 742, 748 (Fla. 3d DCA 1978) where, in discussing findings of fact and the appellate function, the court said:
These findings of fact come to this court clothed with the presumption of correctness and will not be disturbed upon appellate review absent a showing that they are clearly erroneous or totally without any substantial evidence in their support. Department of Transportation v. Morehouse, 350 So.2d 529 (Fla. 3d DCA 1977); Courshon v. Fontainebleau Hotel Corp., 307 So.2d 901 (Fla. 3d DCA 1975). We are not however bound by the trial court's legal conclusions where those conclusions conflict with established law. Holland v. Gross, 89 So.2d 255 (Fla. 1956).
"A finding of fact by the trial court in a non-jury case will not be set aside on review unless there is no substantial evidence to sustain it, unless it is clearly against the weight of the evidence, or unless it was induced by an erroneous view of the law. A finding which rests on conclusions drawn from undisputed evidence, rather than on conflicts in the testimony, does not carry with it the same conclusiveness as a finding resting on probative disputed facts, but is rather in the nature of a legal conclusion. 3 Am.Jur. 471. When the appellate court is convinced that an express or inferential finding of the trial court is without support of any substantial evidence, is clearly against the weight of the evidence or that the trial court has misapplied the law to the established facts, then the decision is *512 `clearly erroneous' and the appellate court will reverse because the trial court has `failed to give legal effect to the evidence' in its entirety." Id. at 258.
We first apply these principles to the finding set out in paragraph five of the final judgment which determined that no assignment was ever made by Delex to Oceanic of its rights under the marketing agreement. A careful review of the entire record discloses that this conclusion is simply not supportable. The burden of proof was on plaintiff-appellant to prove the assignment. Apparently, the trial court felt that this burden was not met. However, there was no evidence of non-assignment. Donnelly testified as to what he intended to permit Delex to assign, but this would be material only to the executory and not to the executed part of the contract. Delex procured a buyer for boats and by the terms of the contract became entitled to a commission not only on the initial order but, according to the agreement, on all subsequent "re-orders of the same." Thus, Delex became a creditor of Lantana to the extent of commissions due and to become due by virtue of sales of bridge erection boats to the Argentinian government. This was an assignable chose in action and the assignment was binding upon Lantana whether or not it "approved" or "agreed to" the assignment. Certainly neither Donnelly nor anyone else connected with Lantana would be in a position to testify that Delex did not assign its rights to Oceanic. Moreover, there was evidence that Lantana did acknowledge an assignment and Lantana was not in a position to dictate (or to assume) that less than all of the commissions were assigned. That Lantana did acknowledge the existence of an assignment is at least inferentially established by the following.
First, there is undisputed testimony that before any payments were made to Oceanic, Lantana insisted on a complete release from Delex. It seems reasonable that if only a partial assignment had been contemplated, then a partial release would have been utilized. Otherwise, what would become of commissions due and to become due on resales if Delex had released Lantana but Oceanic was not an assignee as to those? Lantana prepared and furnished this release.
Secondly, payments to Oceanic after Delex had been terminated evidence a further acknowledgment of some kind of assignment.
Thirdly, in April of 1978 a letter was sent by Lantana to Oceanic "... to terminate the marketing arrangement with your firm." It would make no sense for such a letter to have been written if (1) the marketing agreement was never assigned to Oceanic; or (2) the marketing agreement expired by its own terms in 1977, or (3) in either event the only interest Oceanic had was to collect the balance of the $48,000 which was being paid in any event. There would have been nothing to terminate.
In our view the evidence establishes an assignment by Delex to Oceanic of commissions due and to become due as a consequence of sales of bridge erection boats to the government of Argentina.
While not an element in our analysis, we would point out in passing that Delex, at the insistence of Lantana, gave a general release to the latter corporation. Lantana thus would be unjustly enriched to the extent of commissions due on subsequent sales if Oceanic is not permitted to recover (unless other circumstances exist which bar a recovery by Oceanic).
We next consider the finding which is stated in conclusory fashion in paragraph nine of the judgment that Oceanic has been paid in full. Implicit in this conclusion is a finding that Delex agreed to a reduction in commissions from five percent to $3,000 per boat. At the time this modification to the written contract was purportedly made, Delex was the marketing representative. The party who alleges that a contract has been modified has the burden of proving it. Newkirk Construction Corp. v. Gulf County, 366 So.2d 813 (Fla. 1st DCA 1979). Thus, the burden of proof was on Lantana to show oral modification of the terms of the written contract between Lantana and Delex. The subsequent assignment and its effect is immaterial to this issue.
*513 While at least one other agent of Lantana testified to some modification, the only competent evidence produced in support of modification was the testimony of Donnelly and the copies of documents sent to Oceanic in 1978 which referred to total commissions due of $48,000 on the first Argentinian order. Infante steadfastly maintained, on behalf of Oceanic, that he never agreed to such a modification.
Taking the written evidence first, there are several plausible explanations for the failure of Oceanic to promptly object to the figures referred to in the accountings. For example, the original order was for ten boats (with an option for six which was later exercised). A full commission of five percent on ten boats with a selling price of $98,000 per boat would be $49,000. The account submitted to Oceanic dated January 31, 1978 recited: "Commission on Total Contract $48,000." This is an even more interesting coincidence when we recall that Oceanic stipulated that it had received $48,000 and the books of Lantana showed an additional $1,000 still due and owing, a total of $49,000. Additional factors to be taken into account in assigning appropriate weight to this evidence is the fact that during the period in question Infante was traveling much of the time and, as reflected by the correspondence, there had been almost a complete breakdown in communications between Infante and Lantana at this point. In any event, mere failure to object in this instance did not constitute an account stated. The basic premise of an account stated action, which presupposes some indebtedness, is that the statement fixing the various sums constituting the debt are correct, not the existence of the debt itself. Nicolaysen v. Flato, 204 So.2d 547 (Fla. 4th DCA 1967). Likewise, a statement of account rendered without objection cannot establish the nonexistence of a debt. In the present case, Oceanic did not dispute the $48,000 debt resulting from transactions between the parties; rather it asserted the existence of an additional debt. Accordingly, Lantana did not establish an account stated for all transactions between the parties.
The testimony of Donnelly is similarly unpersuasive on this issue. Nowhere does he directly testify that Infante or anyone else on behalf of Delex said, in so many words, "I agree to a modification." He was not even able to testify as to when such a conversation might have taken place. Prudence if not necessarily the law, would seem to dictate that a modification of this magnitude should be put in writing. The fact that it was not suggests that such a modification was never firmly established between the parties. We are left to speculate as to whether the supposed reduction was to apply only to the first order on which the bid was being computed, or on subsequent re-orders (at greatly increased prices and entirely different cost structures) or on all sales in which Delex became entitled to a finder's fee.
On balance, we find precious little to support a finding that appellee sustained its burden of proof on this issue. We none-the-less stop short of substituting our judgment for that of the trial court on this mixed question of fact and law.
We are not unaware of the fact that the credibility of Infante was severely impeached in the area of violation of the covenant prohibiting Delex from representing a competitive line. Perhaps the trial court was influenced by this factor in assigning credibility to the various witnesses. We nevertheless have concluded that the result reached on the second issue, assignment of rights under the marketing agreement, is erroneous and requires a new trial. Since, on remand, violation of this covenant against competition may become relevant, we discuss it here briefly.
Appellee takes the position that if in fact Oceanic violated the covenant then, even if the assignment from Delex to Oceanic is recognized, Oceanic forfeited its rights to commissions, relying on Ross v. Calamia, 153 Fla. 151, 13 So.2d 916 (1943). We read the case differently. In our view, commissions already earned (due and to become due on reorder) are not forfeited by a subsequent violation of the covenant.
Having previously concluded that the final judgment is erroneous, we reverse and *514 remand for a new trial on the issue of the amount due appellant by virtue of the assignment to it of the entitlement of Delex under the marketing agreement as modified by substituting a commission of $3,000 per boat for the original 5% per boat.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
LETTS, C.J., and DOWNEY, J., concur.