434 So.2d 957 (1983)
Charles J. MALKUS, Appellant,
v.
Steven Robert GAINES, Appellee.
Nos. 82-486, 82-1333.
District Court of Appeal of Florida, Third District.
June 14, 1983.
Rehearing Denied August 10, 1983.
*958 Daniels & Hicks and Elizabeth K. Clarke, Miami, Thomas L. David, Coral Gables, for appellant.
Horton, Perse & Ginsberg and Edward Perse, Miami, for appellee.
Before BARKDULL, HUBBART and JORGENSON, JJ.
BARKDULL, Judge.
By these consolidated appeals, the defendant in the trial court seeks review of a final judgment which reads in part as follows:
THIS CAUSE came on for trial before the Court, both sides having waived jury trial, and the Court having heard the evidence, having examined the documents introduced by the parties, and being otherwise duly advised, makes the following findings of fact and conclusions of law:
1. This Court has jurisdiction of the parties and the subject matter of this action.
2. Plaintiff, STEVEN ROBERT GAINES, and Defendant, CHARLES J. MALKUS, are partners in Kendall-Continental, Ltd., a Florida limited partnership (herein the "Partnership").
3. The Partnership owns the Continental Gardens Apartments, a Two Hundred Eight (208) unit rental complex located at 7941 S.W. 104 Street, Miami, Florida, having acquired same in October of 1978.
4. In August of 1978, Defendant MALKUS induced Plaintiff GAINES to agree to make a One Hundred Eighty Thousand and No/100 Dollar ($180,000.00) cash investment in the Partnership by representing to GAINES that MALKUS was making an identical cash investment, and by further representing that the total purchase price of the Continental Gardens Apartments to the Partnership would be Four Million One Hundred Fifty Thousand and No/100 Dollars ($4,150,000.00).
5. At the time, MALKUS knew that the representations made to GAINES were untrue, and knew and intended that GAINES rely upon same in making the investment. GAINES did rely on the aforementioned representations in acquiring his Partnership interest.
6. MALKUS did not invest One Hundred Eighty Thousand and No/100 Dollars ($180,000.00) for his sixty percent (60%) interest in the Partnership. His total investment was One Hundred Seventeen Thousand Two Hundred Fifty and No/100 Dollars ($117,250.00).
7. MALKUS accomplished this ruse by exacting a Sixty-Two Thousand Two Hundred Fifty and No/100 Dollar ($62,250.00) rebate from the broker involved, and by advising GAINES that he had merely borrowed the money from the broker, agreeing to repay it within a *959 short period of time. MALKUS had, in fact, not borrowed the money, nor has he ever paid it back. The broker testified at trial that MALKUS had no obligation to repay the Sixty-Two Thousand Two Hundred Fifty and No/100 Dollars ($62,250.00).
8. MALKUS never permitted GAINES or the Partnership to share in the Sixty-Two Thousand Two Hundred Fifty and No/100 Dollar ($62,250.00) rebate, nor did he ever acknowledge its existence as a rebate until it was ultimately uncovered in an audit by the Internal Revenue Service.
9. A fiduciary relationship existed between MALKUS and GAINES, both at the time that MALKUS misrepresented his proposed investment in the Partnership to GAINES, and at the time that MALKUS received the rebate from the broker.
10. MALKUS committed a willful and flagrant breach of his fiduciary obligations to GAINES in misrepresenting his investment in the Partnership and in receiving the secret rebate from the broker.
11. MALKUS defrauded GAINES by misrepresenting his investment in the Partnership so as to induce GAINES to invest One Hundred Eighty Thousand and No/100 Dollars ($180,000.00) for a forty percent (40%) interest in the Partnership.
12. MALKUS converted monies belonging to the Partnership by accepting a Sixty-Two Thousand Two Hundred Fifty and No/100 Dollar ($62,250.00) rebate from the broker in that such monies rightfully constituted Partnership property.
13. MALKUS acquired his interest in the Partnership through fraud and deceit, and in large part by using monies contributed by his partner. MALKUS had insufficient funds to make his required cash capital contribution at the inception of the Partnership, and therefore embarked upon a scheme to defraud GAINES and use Partnership assets to acquire a sixty percent (60%) interest in the Partnership.
14. MALKUS was under a duty to fully and fairly disclose to GAINES every material fact which might in any way influence his judgment, and his failure to do so, by his withholding of material information from GAINES, operated as a legal or constructive fraud against GAINES.
15. MALKUS was not a licensed real estate broker at the time he received the commission rebate, and his acceptance of a rebate from the broker violated the statutes and regulations of the State of Florida and of the Florida Real Estate Commission.
16. MALKUS undertook an elaborate scheme to avoid disclosure of the true nature of his investment, and of the rebate, hiding same from his partner, the Partnership's attorneys, the Partnership's auditors, and the Internal Revenue Service, and by representing to PYMS-SUCHMAN Real Estate Company that he had not received a commission on the transaction.
17. MALKUS was a salesman for PYMS-SUCHMAN Real Estate Company when he accepted the commission rebate from the broker in October of 1978. He was obligated to share the rebate with that firm. MALKUS never disclosed the rebate to PYMS-SUCHMAN, nor did he ever share the commission with them.
18. GAINES had the right to rely upon representations made to him by his partner, and had no duty to investigate their accuracy. Indeed, MALKUS urged GAINES not to become involved in an investigation with respect to the acquisition of the property, representing that he was an employee of the selling entity and fully familiar with each and every aspect of the proposed transaction.
19. MALKUS misrepresented the true purchase price of the Continental Gardens Apartments to GAINES by failing to advise him that it had been indirectly reduced by the sum of Sixty-Two Thousand Two Hundred Fifty and No/100 Dollars ($62,250.00).

*960 20. The actions of MALKUS in misrepresenting his investment in the Partnership, and in receiving a secret rebate from the broker, constituted a willful and flagrant breach of the warranties and representations given by MALKUS to GAINES, which warranties and representations are set forth in Exhibit "B" to the Partnership Agreement of Kendall-Continental, Ltd.
21. GAINES first became fully cognizant of the aforementioned breaches of representations and warranties on December 22, 1980, at which time the true facts concerning the brokerage transaction were disclosed to the IRS by Defendant's attorney.
22. MALKUS was not living at 14621 S.W. 78 Avenue, Miami, Florida, in December of 1980. Said address was the only address provided in the Partnership Agreement for the providing of formal notices to MALKUS concerning Partnership business. MALKUS had changed residence addresses several months earlier and had not provided GAINES with notice of such change in the form and manner provided for in paragraph 23.3 of the Partnership Agreement.
23. The summons and complaint filed by Plaintiff in this case was served upon MALKUS less than thirty (30) days from the date on which GAINES learned of the facts constituting breaches of the representations and warranties described above. The original complaint advised MALKUS of the breaches of representations and warranties, and demanded that MALKUS sell his Partnership interest to GAINES pursuant to paragraph 7 of the Representations and Warranties dated October 12, 1978, a copy of which is attached to the Partnership Agreement as Exhibit "B". MALKUS therefore had actual notice of GAINES' intention to exercise his rights under Exhibit "B" to the Partnership Agreement within the time prescribed for such notice in Section 17.6 of the Partnership Agreement.
24. It would have been a futile and useless act for GAINES to have sent a registered letter to MALKUS at 14621 S.W. 78 Avenue, Miami, Florida, on December 23, 1980, demanding that MALKUS sell his Partnership interest to GAINES, in that MALKUS was not living there on that date. Subsequent correspondence sent by certified mail to the same address, return receipt requested, was returned to GAINES and his attorneys undeliverable by the U.S. Post Office.
25. MALKUS waived his right to require notice by certified mail at the aforementioned address when he moved from that address and failed to provide GAINES and the Partnership with notice of his new address as required by paragraph 23.3 of Partnership Agreement.
26. The failure of GAINES to have mailed a demand letter to MALKUS at 14621 S.W. 78 Avenue prior to the commencement of his suit for specific performance is nothing more than a technical oversite, and may not be relied upon by MALKUS to defeat GAINES' prayer for equitable relief in this action in view of MALKUS' outrageous conduct and in view of his actual receipt of the summons and complaint on a timely basis.
27. Neither the documentary evidence nor the testimony induced at trial support the contention by MALKUS that GAINES knew or should have known of the true nature of MALKUS' scheme. The details of the scheme were never disclosed to GAINES, either verbally or in writing.
28. Equity dictates that MALKUS not be permitted to enjoy the benefits of a bargain which was the product of fraud and deception.
29. At the date of trial, MALKUS had a net worth of in excess of Three Million Dollars ($3,000,000).
WHEREUPON, it is ORDERED and ADJUDGED as follows:
A. Judgment is hereby entered as set forth herein below:
B. The Court hereby declares that the entire Partnership interest of CHARLES J. MALKUS in Kendall-Continental, Ltd., is and has been held by MALKUS for the *961 benefit of STEVEN ROBERT GAINES under a constructive trust since October 12, 1978.
C. The entire Partnership interest of CHARLES J. MALKUS in Kendall-Continental, Ltd., is hereby declared to be the sole and exclusive property of STEVEN ROBERT GAINES, and CHARLES J. MALKUS is hereby declared to have transferred same to GAINES by operation of law.[1] (footnote added)
On appeal the appellant first contends the trial court erred in finding fraud, and therefore, wrongdoing on the part of the defendant, and second, even if fraud and wrongdoing were present, the trial court erred in forfeiting the defendant's entire interest in the venture. As to the first contention, we affirm. There is ample evidence to support the trial court's finding, in effect, of fraud in the inducement. Oceanic International Corporation v. Lantana Boatyard, 402 So.2d 507 (Fla. 4th DCA 1981); Jones v. Jones, 338 So.2d 60 (Fla. 3d DCA 1976); Alter v. Finesmith, 214 So.2d 732 (Fla. 3d DCA 1968).
As to the second point, we reverse and hold that the proper relief that the trial judge should have granted would have been to adjust the ownership in the venture in accordance with the funds actually advanced, to wit: $180,000.00 by Gaines and $117,250.00 by Malkus. This result comports with the Supreme Court of Florida's decision found in Donahue v. Davis, 68 So.2d 163 (Fla. 1953).[2] *962
*963 This is in accord with the modern view of a constructive trust where one in a fiduciary capacity commits a fraud. Vol. V, Scott on Trusts, 3rd Ed., § 516; Restatement of the Law, 2nd Ed., Trusts 202 h, p. 449.
Therefore for the reasons stated, the matter is returned to the trial court with directions to amend its final judgment in accordance with this decision and opinion in the allocation of interest and to adjudicate such other relief as the plaintiff may be entitled to under the pleadings and in particular as provided in Paragraph 7 of the Warranties and Representations.[3]
Affirmed in part, reversed in part and remanded with directions.
NOTES
[1] The trial court made other observations as to the type of relief it would grant the plaintiffs if it had not terminated all Malkus' interest in the joint venture. By this opinion we do not approve or disapprove of the trial court's observations. Any appellate review thereon will have to await an actual ruling by the trial court.
[2] This opinion reads in part as follows: "the appellants, who were the plaintiffs in the court below, instituted this suit in the Circuit Court of Dade County, Florida, against the appellees for the purpose of establishing a joint venture contract alleged to have been entered into by the parties and for an accounting. The decree in the cause was in favor of the defendants and the plaintiffs appealed." ...

* * * * * *
"The prayer of the complaint was for an accounting between the parties as to the contributions made by each, and that the individual defendants be adjudicated to have no interest in the lands, or, in the alternative, that the defendants be adjudicated to be trustees of the stock for the plaintiffs and be required to transfer their stock to the plaintiffs in the measure of the respective capital contributions of the parties"... .
* * * * * *
"The cause thus being at issue on the complaint and answers a special master was appointed to hear the evidence and to make findings. After all evidence had been submitted the master filed a full and comprehensive report in which he found substantially as follows"...
* * * * * *
2. "A joint venture existed between the parties for the purchase of the property from the owner, a Mrs. Price, through the medium of O'Connell Investment Company.
3. Davis breached his trust to the remaining coadventurers and hence holds his 25% of the stock of the corporation as trustees for the others"... .
* * * * * *
9. "Equity should restore the parties by reallocating the stock to each party in the ratio that his actual contribution bore to the actual purchase price of the property. The defendant Davis filed exceptions to the master's report. These were sustained at final hearing"... .
* * * * * *
[6, 7] "A joint adventure has been defined as an agreement among two or more persons to purchase specific property for speculation or resale at a profit, the only distinction between such an agreement and one of partnership being the limited and specific object in view. Drew v. Hobbs, 104 Fla. 427, 140 So. 211, 141 So. 596. The fact that joint adventurers may determine to carry out the purpose of the agreement through the medium of a corporation does not change the essential nature of the relationship. Mendelsohn v. Leather Mfg. Corp., 326 Mass. 226, 93 N.E.2d 537. Compare Fancher v. Rumsey, 121 Fla. 631, 164 So. 688.
[8] As to the general duties and obligations of joint adventurers toward each other, they, like co-partners, owe to one another, so long as the relationship continues, the duty of the finest and highest loyalty. "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. * * * Conduct subject to that reproach does not receive from equity a healing benediction." Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1.
The principle is peculiarly applicable in a situation where one person induces another to enter into a transaction for the joint purchase of property on equal terms and for the benefit of both. In such a case it becomes the duty of the purchaser toward his co-adventurer fully and honestly to disclose the true purchase price of the property to be acquired together with all terms, conditions and other details of the transaction; and he lays himself open to an action for fraud if he misrepresents the matter in any essential particular and thereby induces his associate to contribute more than his share of the actual consideration paid, or by virtue of undisclosed facts or secret negotiations with the seller receives for his share more than is his due under his arrangement with his associate. Willis v. Fowler, 102 Fla. 35, 136 So. 358. For, as stated in Quinn v. Phipps, 93 Fla. 805, 113 So. 419, 54 A.L.R. 1173, "He who undertakes to act for another in any matter of trust or confidence shall not in the same matter act for himself against the interest of one relying upon his integrity.
[9] Upon the issue as to whether a joint venture actually existed between the parties in respect to the purchase of the property the special master found in favor of the plaintiffs. We think that in view of the great mass of evidence before him proving the relationship between the parties this finding was proper. As the result of the relationship which the master found to exist between the parties, the defendant Davis duped the plaintiffs into putting up the great bulk of the purchase price of the property and thereby obtained for himself, without the investment of a single dollar, the difference between the pretended sales price of $18,900 and the amount of $11,232.31 actually paid to Mrs. Price for her interest in the property. Since he misrepresented the material facts to his coadventurers, and contributed nothing to the purchase price of the property, it would be the height of inequity to allow him to retain any interest therein. Lane v. Wood, 259 Mich. 266, 242 N.W. 909; Mannheimer v. Phinney, 167 Minn. 279, 209 N.W. 7; Fink v. Weisman, 129 Cal. App. 305, 18 P.2d 961. 48 C.J.S., Joint Adventures, § 11. Accordingly, it is our duty to reverse the trial court in respect to this issue and to hold with the view of the special master "that the fifteen shares of the common capital stock of O'Connell Investment Company issued and held by the defendant Davis were acquired by him through fraud and it is against equity that such shares should be retained by Davis."
[10] The fact that since the acquisition of the property by the parties through the medium of the corporation the property has risen in value and hence the plaintiffs have profited by the venture despite the fraud practiced by Davis, does not change our conclusion in respect to this issue. The contract between the parties amounted, in legal effect, to an agreement that each would contribute one-fourth of the true purchase price and each would be entitled to a one-fourth interest, including the profits thereon, on the basis of the actual price paid. Compare Moe v. Lowry, 69 Colo. 371, 194 P. 363; Arnold v. Ames, 159 Tenn. 635, 21 S.W.2d 386; Fitch v. Ingalls, 271 Mass. 121, 170 N.E. 833, 30 Am.Jur., Joint Adv. § 36.
The trial court apparently attached great significance to the fact that prior to entering into the transaction, the plaintiffs Donahue and Kilburn inspected the property for the purpose of determining whether in their opinion the land was worth $15 an acre, the price Davis fraudulently represented was necessary to be paid in order to acquire title. This fact might have been material had the parties been dealing at arm's length as buyer and seller in respect to the purchase of the property; but it has no significance in the light of the fraudulent representations made by Davis to induce the plaintiffs to enter into a joint venture by which the property was to be acquired at the falsely stated price of $15 an acre, when the fact was known to Davis that it could be purchased for a lesser figure. Whatever the worth of the property might have appeared to the plaintiffs to be upon inspection, the fact remains that Davis, in order to induce the plaintiffs to enter into the joint venture, falsely represented that the cost was $15 an acre, and the plaintiffs were entitled, from the very nature of the proposal made by Davis to repose confidence and trust in his statements, and to expect of him a truthful disclosure of the actual amount at which the owner was willing to sell the property. Annotation 62 A.L.R. 13. Compare Stephens v. Orman, 10 Fla. 9; Dale v. Jennings, 90 Fla. 234, 107 So. 175.
Finally, we consider that portion of the decree which deals with the interest in the property asserted by O'Connell. The special master found in respect to this claim that in view of the relationship of the parties, one to the other, O'Connell was under the duty and obligation to disclose to the plaintiffs the manner and means by which he intended to pay for his proportionate share in the venture, namely, by crediting on his share of the purchase price a secret commission of $1890 (the equivalent of six share of stock in the corporation) which Davis was to allow him for his aid in interesting Donahue and Kilburn in the venture. Because of this failure to make a full and fair disclosure the master found in his report that O'Connell became a trustee for the plaintiffs to the extent of the six shares of stock held by him. And so far as we can ascertain from the record before us O'Connell never filed exceptions to this finding of the special master; nor are we quite clear from a study of the decree to what extent, if any, the trial court granted relief to O'Connell from this portion of the special master's findings.
However that may be, we are concluded from a careful study of the evidence that the special master, who had the witnesses before him, ruled correctly in disallowing the commission and that his findings and recommendations in this particular should have been confirmed by the trial court. Harmon v. Harmon, Fla., 40 So.2d 209.
Accordingly, the decree appealed from should be reversed with directions that a decree be entered overruling the exceptions taken by Davis to the report of the special master and granting relief to the plaintiffs in accordance with the recommendations of the master and in conformance with this opinion."
[3] "7. In the event of a breach of warranty or representation, Malkus shall be deemed to have offered to sell his partnership interest to Gaines at the book value thereof at the time of discovery of such breach in addition to the other rights or remedies at law or equity Gaines may have by reason of such breach. The notice, closing and other procedures for the exercise of such purchase right shall be as provided in Section 17.6 of the Partnership Agreement."