476 So.2d 220 (1985)
Charles J. MALKUS, Appellant,
v.
Steven Robert GAINES, Appellee.
Nos. 82-486, 82-1333, 84-2662 and 84-2685.
District Court of Appeal of Florida, Third District.
August 6, 1985.
Rehearing Denied December 10, 1985.
*221 Anderson, Moss, Russo, Gievers & Cohen; Daniels & Hicks and Elizabeth K. Clarke; Thomas L. David, Miami, for appellant.
Horton, Perse & Ginsberg and Edward A. Perse, Fowler, White, Burnett, Hurley, Banick & Strickroot, Miami, for appellee.
Before BARKDULL, HUBBART and JORGENSON, JJ.
BARKDULL, Judge.
Following our earlier opinion in Malkus v. Gaines, 434 So.2d 957 (Fla. 3d DCA 1983) the matter recurred in the trial court on a petition to enforce the mandate.[1] After hearing, the trial judge adjusted the percentage of ownership crediting Malkus with a 20% interest as a finder's fee and then apportioning the remaining 80% in accordance with the funds actually advanced. He refused to permit Gaines to exercise his rights in accordance with paragraph 7, finding that same constituted a penalty. He awarded Gaines $100,000 as punitive damages against Malkus and found Malkus to be a full partner. He gave Malkus a judgment of some $307,166 against Gaines for allegedly excessive cash withdrawals.
This order has been brought to this court for review.[2] We find first, that the trial court erred in apportioning the ownership interest otherwise than in accordance with the funds advanced. Under the evidence $180,000 was advanced by *222 Gaines and $117,750[3] was advanced by Malkus. This would give them an interest as follows: Gaines 60.45% and Malkus 39.55%. Secondly, we find that the trial court erred in determining paragraph 7 to be a penalty. Whether or not a particular clause in a contract is a valid provision or one that constitutes a penalty is to be determined as of the date of the agreement. See Hutchison v. Tomkins, 259 So.2d 129 (Fla. 1972); Dade National Development Corp. v. Southeast Investments of Palm Beach County, Inc., 471 So.2d 113 (Fla. 4th DCA 1985), Bruce Builders, Inc. v. Goodwin, 317 So.2d 868 (Fla. 4th DCA 1975); Compare Amerifirst Federal Savings and Loan Association v. Cohen, 454 So.2d 626 (Fla. 3d DCA 1984). There is no reason to hold that the provisions under the facts of the instant case are a penalty, particularly in light of the fact that Malkus knew the purpose for the provisions of paragraph 7 was to secure the warranties (which he knew at the time he signed the agreement were false). Shore Investment Company v. Hotel Trinidad, Inc., 158 Fla. 682, 29 So.2d 696 (1947); Fulton v. Clewiston Company, Inc., 100 Fla. 257, 129 So. 773 (1930); Hill v. Lummus, 123 So.2d 365 (Fla. 3d DCA 1960). Even if the provisions are a penalty (which we do not here find) the equity court should not lend its extraordinary powers to benefit one who is guilty of a fraud or who has "unclean hands". Hauer v. Thum, 67 So.2d 643 (Fla. 1953); Dale v. Jennings, 90 Fla. 234, 107 So. 175 (1925); Hensel v. Aurilio, 417 So.2d 1035 (Fla. 4th DCA 1982).
Therefore for the reasons above stated, we affix the parties respective ownership interest in the partnership as 60.45% Gaines and 39.55% Malkus. We agree, as we did in the prior opinion, that Gaines can enforce the provisions of paragraph 7.[4]
The next question is what is the proper interpretation of "book value".[5],[5a],[5b]
*223 The better rule seems to be in a "buyout" situation that "book value" should be interpreted to mean market value less liabilities, which would equal equity, with the ownership percentages being applied to the equity and we adopt such a rule in the instant case. The equity in the property should be ascertained as of December 22, 1980, the date when Gaines evidenced his intention to exercise his rights under paragraph 7. The matter will have to be returned to the trial court for an evidentiary hearing to determine the market value (as of that date) and the liabilities to establish the partnership equity in the property. Thereupon Malkus' 39.55 interest therein shall be applied to the equity to find the amount that Gaines must pay to exercise his right under paragraph 7. Because we have readjusted the ownership in the partnership from its inception until the date *224 that Gaines exercised his rights under paragraph 7, it will be necessary for an accounting to be had of the respective parties withdrawals so that they be credited with their correct amount from the date of inception until the date Gaines exercised his rights under paragraph 7.[6] During that period Malkus was entitled to 39.55% of the earnings and Gaines was entitled to 60.45%.
Malkus should be ordered to return any funds drawn from the partnership subsequent to the date Gaines exercised his rights under paragraph 7, to wit: December 22, 1980. Gaines would also be entitled to credit these sums against the purchase price of Malkus' interest.
If, following the accounting, there is a balance in favor of Gaines he may deduct this amount from the funds necessary to purchase Malkus' interest pursuant to paragraph 7, as above outlined. If following the accounting there is a balance in favor of Malkus, a judgment for such an amount should be entered in his favor.[7]
In view of the above findings we reverse the award of punitive damages awarded for the fraud of Malkus because of Gaines election to proceed under paragraph 7. We also reverse the $307,166.00 judgment against Gaines as being inappropriate in light of this opinion and we return the matter to the trial court for further proceedings relating to the value of Malkus' 39.55% in the partnership as of December 22, 1980 and an accounting of partnership earnings between the date of inception and December 22, 1980 as above set forth.
Reversed and remanded with directions.
NOTES
[1] See the earlier opinion for factual background.
[2] Gaines filed an appeal and an original prohibition proceeding and a petition to enforce the mandate. We choose to consider the matter as a petition to enforce the mandate and have consolidated all cases.
[3] There was an error in the original opinion, the amount should have been $117,750 instead of $117,250.
[4] Paragraph 7:

7. "In the event of a breach of warranty or representation, Malkus shall be deemed to have offered to sell his Partnership interest to Gaines at the book value thereof at the time of discovery of such breach in addition to the other rights or remedies at law or equity Gaines may have by reason of such breach. The notice, closing and other procedures for the exercise of such purchase right shall be as provided in Section 17.6 of the Partnership Agreement."
[5] We requested the parties to file supplemental briefs on the proper interpretation of "book value" under the facts of this case.
[5a] Gaines contends that "book value" should be construed as follows. "ARGUMENT RE: "BOOK VALUE" Malkus has continuously tried to avoid the direct and obvious meaning and impact of the "buy out" provisions contained in paragraph 7 of the partnership agreement. He refuses to do what he agreed to do and seeks to make the most of his defalcations and avoid the consequences thereof.

The Partnership Agreement uses the term "fair market value" in connection with voluntary retirement of an honest as opposed to dishonest partner (paragraph 18.8) and contrasts the term with "basis" respecting property distributed in kind upon dissolution (paragraph 21.6). "Book value" is the contrasting alternative in certain cases  it applies where the partner improperly tries to sell or assign his interest (paragraph 17.6) or breaches the warranties and representations (paragraph 7), the case herein.
"Book value" is defined by Webster's Ninth New Collegiate Dictionary (1983) as:
"the value of something as shown on the bookkeeping records as distinguished from market value." It is similarly defined by Black's Law Dictionary (5th Ed. 1979). See also County Of Cook v. Vulcan Materials Co., 16 Ill.2d 385, 158 N.E.2d 12 (Ill. 1959).
In Jones v. Harris, 63 Wash.2d 559, 388 P.2d 539, 540-541 (1964), the court stated:
* * * * * *
"[Book] value does not usually reflect fluctuations in marketability caused by either inflationary-deflationary trends, nor going concern against salvage values of an ongoing business.
* * * * * *
"[It] is a well known fact that there may be a vast difference between book value and actual or fair market value."
* * * * * *
"[Book] value normally means the value of the corporation as shown on the books of account, after subtracting liabilities."
* * * * * *
The terms "book value" and "market value" simply are not the same or even synonymous. See Cates v. Cates, 217 Ga. 626, 124 S.E.2d 375 (1962). Accord, Succession Of Jurisich, 224 La. 325, 69 So.2d 361 (La. 1953); Rubel v. Rubel, 221 Miss. 848, 75 So.2d 59 (1954). As the Cates court explained:
* * * * * *
"book value of an asset ordinarily means the cost of that asset. Such book value may be reduced by book entries for depreciation or obsolesence... . The rise and fall in the value of an asset is not usually recognized by its book value. Thus the book value of an asset at any given time may be more or less than its value."
* * * * * *
In sum then  `the proper interpretation of `book value' under the circumstances of this case as reflected by the record' is the value of a partner's capital account as reflected on the books of the partnership at any given point in time."
[5b] Malkus contends, in part, that "book value" should be interpreted as follows. "Although Gaines now contends that the meaning of `book value' as used in Paragraph 7 is clear and unambiguous, neither the record nor the cases cited by Gaines support that contention. The following are illustrations of the ambiguities and conflicts surrounding the `book value' clause.

1. Gaines' own accountant has provided two different numbers for `book value' in the record. In his initial affidavit, Mr. Sherburne averred that the `book value' of Malkus' interest on December 22, 1980 was a negative $284,934.00. (Appellee's Appendix, p. 30). In his `supplemental' affidavit, Mr. Sherburne stated that the `book value' was a negative $244,443.00. (Appellee's Appendix, p. 26).
2. In his supplemental brief, Gaines suggests that `book value' and `fair market value' are used consistently throughout the Partnership Agreement. That is, Gaines suggests that `fair market value' is used consistently in connection with voluntary retirement of `honest partners', while `book value' is used consistently in connection with partners who are at fault in some manner. (Gaines' supplemental brief, p. 9). This is inaccurate. Paragraph 18.8 is another forced buy out clause, which provides that a defaulting partner may be bought out at fair market value. Thus, by the semantical device of labelling Malkus' failure to pay his full capital contribution a `breach of warranty' rather than a `default', Gaines could enable himself to argue for buy out at `book value' under his interpretation, rather than `fair market value'. Paragraph 18.8 and Paragraph 7 of the Warranties and Representations section are inconsistent and conflicting, and they render the Partnership Agreement ambiguous. Any breach under Paragraph 7 would also be a "default under this Agreement" under Paragraph 18.8, and the Agreement is accordingly ambiguous as to which buy out provision is governing.
* * * * * *
3. The courts themselves have not had an easy task with `book value.' References just to the cases cited by Gaines illustrate the problem. In County of Cook v. Vulcan Materials Co., 16 Ill.2d 385, 158 N.E.2d 12 (1952), the court said: "Book value normally represents cost less reserves for depreciation and depletion." 158 N.E.2d at 15. In Jones v. Harris, 63 Wash.2d 559, 388 P.2d 539 (1964), the court stated: "`Book value' normally means the value of the corporation as shown on the books of account of that corporation, after subtracting liabilities." 388 P.2d at 542.
In Succession of Jurisich, 224 La. 325, 69 So.2d 361 (1953), cited by Gaines, the court found that the term `book value' is not ambiguous. However, in Schumann v. Samuels, 31 Wis.2d 373, 142 N.W.2d 777 (1966), the court found that `book value' is ambiguous.
"Book value" is a term of ambiguous meaning. The certified public accountant who submitted an affidavit on behalf of the defendant gave as his opinion that "the term `book value' is generally such that this phraseology should be avoided as a valuation measure unless it is specifically and explicitly defined in the agreement concerned.
142 N.W.2d at 778. The Schumann court noted that there, as in the instant case, the partnership agreement failed to define `book value.' "unfortunately, the agreement of partnership here does not so define `book value' that we are able to find precise meaning in the terms of the agreement. However, in the absence of a definition agreed upon by the parties, the term has a well defined meaning in Wisconsin law: "The book value is not any arbitrary value that may be entered upon the books of the company but the value of the assets of the company after deducting its liabilities.'" 142 N.W.2d at 779.
[6] During this period Malkus would be entitled to such sums as would compensate him for managing the project.
[7] If the reverse should occur, no judgment may be entered in favor of Gaines, he having waived any such right in these proceedings if he acquired all of Malkus' interest in the property.