728 So.2d 799 (1999)
Melvin BUSH, Appellant,
v.
Robert M. AYER, Audree A. Ayer, and Irene M. Malkus, Appellees.
No. 97-4376.
District Court of Appeal of Florida, Fourth District.
March 3, 1999.
Rehearing Denied April 12, 1999.
*800 Julie K. Oldehoff of Law Offices of Grazi & Gianino, Stuart, for appellant.
James A. Freese, Stuart, for Appellees-Robert M. Ayer, and Audree A. Ayer.
OWEN, WILLIAM C., Jr., Senior Judge.
The vendee under a putative contract for sale of a vacant lot sued the vendors for breach of contract, specific performance, and fraud after they refused to close the sale. The court denied relief, finding that the contract had not been accepted by the vendee in the manner which vendors, as offerors, had specified, and that vendors had not waived strict compliance. We conclude, on undisputed facts, that the vendors, by their conduct, had waived strict compliance as a matter of law and, therefore, it was error to find there was no contract.
Our discussion is necessarily fact intensive. Appellant Bush wanted to purchase vacant property (Lots 12 and 13) adjacent to property he owned in Port St. Lucie. A realtor informed him Lot 12 was owned by Audree Ayer and Irene Malkus (whom he later learned was the mother of Audree) and Lot 13 was owned by Robert Ayer and Audree Ayer, appellees, all of whom lived in Ohio. After Bush called Mrs. Malkus and discussed with her a possible sale of the two lots, he told his attorney, Mr. Grazi, that the parties had reached an agreement. At Bush's instruction, Grazi prepared and mailed to Malkus two unsigned contracts, one for each lot, for the agreed price.
A few days thereafter, Mr. Freese, an attorney representing the appellees, sent Grazi a letter dated May 7, 1996 (the "cover letter") in which he stated that appellees had agreed to sell the lots, provided Bush paid all closing costs. Enclosed with the letter was a facsimile copy of the contract which had been prepared by Grazi on Lot 13, but now with the appellees' signatures and their handwritten modifications relieving them from payment of any closing costs. In the cover letter, Freese also stated:
Enclosed, please find a copy of the counter-offer to sell Lot 13, signed by Mr. Robert M. Ayer and Mrs. Audree S. Ayer. I believe the other contract has the identical changes and has been signed by Mrs. Irene S. Malkus and Mrs. Audree Ayer.[1] I do not have a copy yet, because there was a problem in the fax transmission, but I am expecting the original contracts in the mail and will forward copies to you a.s.a.p. Please forward these counter-offers to your client, Mr. Bush, and explain the changes. If he is willing to consider the terms proposed by my clients, then please contact me and I will deliver the original signed contracts to your office for his review and execution.
Once there is a complete bilateral contract for each lot, then we can discuss making preparations for closing.
On the day that Grazi received the cover letter, Bush came to Grazi's office, agreed to the changes proposed by appellees, and signed the facsimile copy of the Lot 13 contract to indicate his acceptance. Without question, the cover letter adequately supports the trial court's finding that (1) the facsimile signed by appellees was intended as a written offer, and (2) the cover letter specified the manner of acceptance to be by Bush executing the original hard copy of the contract *801 if he agreed to the modifications. It is likewise not to be disputed that Bush accepted appellees'"counter-offer," but that his acceptance was not in the manner designated in the offer, i.e., he did not execute the original hard copy.[2] Because generally, for acceptance of an offer to result in a contract, the acceptance must be made in the manner, at the place, and within the time expressly or impliedly designated in the offer, Strong & Trowbridge Co. v. H. Boars & Co., 60 Fla. 253, 54 So. 92, 94 (1910), the issue for us is whether we can say that on the undisputed facts the appellees by their conduct waived strict compliance.
A waiver may be express or implied, and may be inferred from conduct or acts that warrant the inference that a known right has been relinquished. See Torres v. K-Site 500 Assocs., 632 So.2d 110, 112 (Fla. 3d DCA 1994). Although waiver is generally a question of fact as to which an appellate court may not reevaluate evidence and substitute its judgment for that of the trial court, Brown v. Powell, 531 So.2d 731, 735 (Fla. 4th DCA 1988), an appellate court may properly consider whether the trial court's findings are supported by competent evidence. Puritz v. Rosen, 442 So.2d 278, 280 (Fla. 4th DCA 1983). Further, a finding which rests on conclusions drawn from undisputed evidence, rather than on conflicts in the evidence, does not carry with it the same conclusiveness as a finding resting on probative disputed facts, but is rather in the nature of a legal conclusion. See Holland v. Gross, 89 So.2d 255 (Fla.1956); Oceanic Int'l Corp. v. Lantana Boatyard, 402 So.2d 507 (Fla. 4th DCA 1981). We are not bound by the trial court's legal conclusions where those conclusions conflict with established law. In Re Estate of Donner, 364 So.2d 742 (Fla. 3d DCA 1978). Thus, we examine the appellees' conduct after Bush signed the facsimile copy of the Lot 13 "counter-offer."
The same day that Bush signed the facsimile copy, Grazi informed Freese that Bush had expressed his agreement to the changes made by appellees and had signed and accepted the contract, and that he (Grazi) was taking the contract to a title company to have closing documents prepared. Mr. Freese voiced no protest that there was not, at that point in time, a contract between the parties, nor did he suggest that there could be no contract until he had delivered the hard copy for Bush to sign.
The next day, the title company prepared closing documents on both Lot 12 and Lot 13 and sent them directly to appellees by Federal Express. Included among the documents, which indicated a closing date of May 14, were the proposed deeds to be executed by appellees and Mrs. Malkus,[3] as well as settlement statements which included a credit to Bush for the sellers' pro-rata share of the current year's ad valorem taxes. Appellees' attorney promptly voiced to Grazi an objection to the tax proration because appellees felt such was a violation of the "no closing costs" provision. The attorneys then agreed that the sellers would not be responsible for any part of the taxes, and Grazi had the title company prepare revised settlement statements. Significantly, appellees at that point did not voice any protest or objection that a signed contract did not exist. Rather, they affirmatively relied on the contract's "no closing costs" provision as entitling them to be relieved of any responsibility for a pro rata share of the taxes.
On May 14, consistent with the contract requirement, Bush delivered his checks to the title company for the amounts required to close. Nonetheless, the contract did not close then, or thereafter. Instead, on May 21, Freese wrote Grazi, stating that, due to the confusion over the two settlement statements, *802 Mrs. Ayer was reluctant to sign documents which had discrepancies in middle initials or in the order of names and, because she felt the closing had been delayed beyond a reasonable time past May 14, she considered the contract void. The letter further stated that in accordance with [a specific provision of] the contract, Freese agreed to a refund of all monies to the buyer. Again, nothing was stated by Freese indicating that he or Mrs. Ayer took the position that no contract had been entered into. Indeed, their stated position was the oppositethe terms of the signed contract had not been met.
Up to that point, the parties and their respective attorneys conducted themselves in all respects as if there was a valid and binding contract for sale of Lot 13. When Grazi replied to Freese's letter with the threat of a lawsuit if closing did not occur, Freese responded, noting for the first time that Bush's acceptance had been by signing the facsimile copy of the contract rather than following the manner of acceptance outlined in the cover letter. However, he further stated (in relevant part):
I have ... discussed this matter with Mrs. Audree Ayer. She does not want this matter to result in litigation.... If Mr. Bush is interested in closing on Lot 13 now and negotiating for the sale of Lot 12 later, then please let me know.... Mr. and Mrs. Ayer are willing to meet their contractual requirements to sell Lot 13; however, there is a problem with Mrs. Irene Malkus. Mrs. Malkus did not sign the contract and now due to [her eye surgery] is not willing or able to sign anything.... If you ... are willing to accept a deed and other closing documents for Lot 13 that are signed by Mr. and Mrs. Ayer without the joinder of Mrs. Irene Malkus, then please let us know.
(Emphasis supplied). While it is true this latter communication from the appellees' attorney was made in an effort to avoid litigation, it nonetheless made clear that the appellees had no real concern with the signed facsimile being the contract on which the sale could still be closed. Furthermore, the letter expressly recognized that theretofore appellees had a contractual requirement to sell Lot 13. Prior to the date set for closing, the parties had proceeded in all respects as if a valid contract existed for the sale of Lot 13. Appellees did not simply fail to assert to the contrary they actively conducted themselves in a manner that left no room for a reasonable inference to the contrary. It would be difficult to imagine a much stronger showing of waiver by conduct than that made in this record. We conclude that the only reasonable inference to be drawn from the undisputed evidence of appellees' conduct is that they waived strict compliance with the designated manner of acceptance of their counter-offer.
The trial court, having concluded there was no contract between the parties, denied appellant any of his requested relief. Our holding, that the parties had an enforceable contract for the sale of Lot 13, requires that the judgment be reversed and this case be remanded for further proceedings consistent therewith. For the purpose of determining to what relief, if any, appellant is entitled, the court may rely upon the evidence before it or, in its discretion, may open the case and take such further evidence as it deems appropriate.
REVERSED.
STONE, C.J., and KLEIN, J., concur.
NOTES
[1] Neither the original nor a facsimile copy of a signed contract on Lot 12 was ever delivered. Mrs. Malkus was originally named as a defendant but later was dismissed from the case. Although Lot 12 is not involved here, the court found that the cover letter did not make the sale of both lots a condition to the sale of Lot 13.
[2] In fact, the hard copy of the "counter-offer" was never delivered by Freese to Bush or his attorney.
[3] Shortly after the contract was delivered to the title company, its representative informed appellant that both Lot 12 and Lot 13 were titled in the names of Robert Ayer, Audree Ayer and Irene Malkus as joint tenants with right of survivorship; also, that the two separate deeds by which they had taken title contained minor discrepancies in their names. Issues implicated by the record ownership of Lot 13 differing from that stated in the putative contract are not before us. The trial court, aware of the possible ramifications, mused over the likelihood of further litigation should he grant specific performance with the record title in that state.