# Third District Court of Appeal

## State of Florida

Opinion filed January 4, 2017.
Not final until disposition of timely filed motion for rehearing.

————————

Nos. 3D15-737; 3D15-382; 3D14-2506
Lower Tribunal Nos. 07-9620; 07-43714

————————

**Maricela Fonseca and Richard Fonseca, et al.,**
Appellants,

vs.

**Taverna Imports, Inc., and Mario Taverna,**
Appellees.

Appeals from the Circuit Court for Miami-Dade County, Sarah I. Zabel and Rosa I. Rodriguez, Judges.

Arnaldo Velez; Gutiérrez Bergman Boulris and Jennifer A. Kerr; Hicks, Porter, Ebenfield & Stein and Dinah Stein, for appellants Maricela Fonseca and Richard Fonseca; Jule Laudisio and Hans Eichmann, in proper persons.

Rosenthal Rosenthal Rasco, Eduardo I. Rasco and Steve M. Bimston, for appellees.

Before WELLS, LAGOA, and EMAS, JJ.

EMAS, J.

## INTRODUCTION

In this consolidated proceeding, each party appeals from various judgments arising out of two lower court actions:

(1) *Taverna Imports, Inc. and Mario Taverna v. Maricela Fonseca, Richard Fonseca, Jule Laudisio and Hans Eichmann* **(Lower Tribunal No. 07-9620) ("Case One")**

In Case One, the trial resulted in a jury verdict totaling $1,896,234 in favor of plaintiffs Mario Taverna and Taverna Imports, Inc.  The Defendants in Case One—Maricela Fonseca, Richard Fonseca, Jule Laudisio and Hans Eichmann (collectively, "the Defendants")—appeal from several judgments[1] arising out of that case, and assert three points on appeal, which are discussed in detail below. For the reasons that follow, we affirm the judgments in Case One with one exception, relating to an aspect of the damages awarded to Mario Taverna and against Maricela Fonseca and Richard Fonseca.

(2) *Richard Fonseca v. Taverna Imports* **(Lower Tribunal No. 07-43714) ("Case Two")**

In Case Two, Taverna Imports appeals from a series of post-judgment orders[2] in which the trial court awarded Richard Fonseca the right to execute on unissued stock of Taverna Imports. For the reasons that follow, we reverse the trial court's order authorizing Fonseca to execute and levy on the corporate stock, as the trial

---

[1] These judgments are appealed under case numbers 3D15-737 and 3D15-382.

[2] These orders are appealed under case number 3D14-2506.

court, under the unique circumstances of this case, should have applied Richard Fonseca's judgment in Case Two (in the amount of $110,309.36) as an offset against the judgment in favor of Taverna Imports in Case One (in the amount of $1,063,234).

## BACKGROUND

Taverna Imports was a closely held wine distribution corporation. Upon its formation in 2002, the Board of Directors was comprised of Mario Taverna, Maricela Fonseca and Hans Eichmann.[3] By a vote of the Board of Directors, Mario Taverna was elected president, Jule Laudisio was elected vice-president, and Maricela Fonseca was elected secretary/treasurer. Maricela and Richard Fonseca contributed the capital to Taverna Imports, and Mario Taverna, together with Hans Eichmann, oversaw sales and controlled daily operations.

At the time of Taverna Imports' formation, the corporation authorized 5000 shares, but issued a total of 4500 shares, in equal amounts of 1500 shares each to Mario Taverna, Maricela Fonseca, and Jule Laudisio. In June 2005, Taverna Imports repurchased 1000 of Jule Laudisio's 1500 shares, and entered into a two-year stock-option agreement which would allow Taverna Imports to purchase Laudisio's remaining shares. As of June 2005, Mario Taverna and Maricela

---

[3]Annual reports from 2004 and 2005 reflect only Mario Taverna and Maricela Fonseca (and not Hans Eichmann) as directors. The 2006 annual report reflects three directors of Taverna Imports: Mario Taverna, Maricela Fonseca, and a third individual named Janelle Hertz.

Fonseca each owned forty-five percent of the shares, and Laudisio owned the remaining ten percent.

Taverna Imports was unprofitable for the first few years of its existence. In mid-2005, Richard Fonseca decided he would no longer contribute capital. Around the same time, Hans Eichmann quit. Thereafter, however, Taverna Imports began to turn a profit through Mario Taverna's efforts. Nevertheless, after Richard Fonseca declined to make further capital contributions, Mario Taverna attempted to find new revenue streams for the company.

Although most of these attempts proved unsuccessful, in early 2007 Mario Taverna entered into a wine-clearing arrangement with Metro Wine ("Metro"), an out-of-state wine distributor and wholesaler who Mario Taverna believed had the potential to alleviate Taverna Imports' cash flow concerns. Mario Taverna negotiated to permit Metro's use of a portion of Taverna Imports' warehouse in exchange for Metro's payment of essentially all of Taverna Imports' overhead expenses for the duration of its warehouse lease. Mario Taverna executed a Memorandum of Understanding ("MOU") with Metro on behalf of Taverna Imports, which memorialized the wine-clearing arrangement. When Mario Taverna broached the subject of the Metro MOU with Richard Fonseca, Fonseca deferred consideration of the issue pending a formal shareholders' meeting to be

held in February 2007. Such an event—a "formal" shareholders' meeting—was alleged to be an unprecedented event in Taverna Imports' history.

Meanwhile, in January 2007, Jule Laudisio agreed to convey her remaining ten percent stock interest back to Taverna Imports in exchange for $5,000, pursuant to a written agreement which she executed on January 26, 2007. Jule Laudisio signed a notarized letter prepared by Mario Taverna which acknowledged Taverna Imports' purchase of her ten percent interest. Mario Taverna issued two checks from Taverna Imports made out and delivered to Jule Laudisio: one for $2,500 dated January 26, 2007, and a second for $2,500, post-dated to September 30, 2007. However, three days after executing the agreement and accepting the checks in exchange for the sale of her stock, Jule Laudisio sent a letter to Mario Taverna, together with the un-negotiated checks, in an attempt to rescind the agreement.

One month later, on February 27, 2007, the "formal" shareholders' meeting took place. Because this was a shareholders' meeting, Mario Taverna expressed his surprise at the presence of Hans Eichmann (who was never a shareholder) and Jule Laudisio (from whom Taverna Imports had purchased her remaining shares a month earlier). Mario Taverna believed that he and Maricela Fonseca were the only remaining shareholders in Taverna Imports (and the only directors at the meeting), with each owning an equal number of shares. Maricela Fonseca

5

announced at this meeting that a shareholder vote would be conducted to elect a new president, despite the corporate bylaws which mandate that only the Board of Directors is empowered to elect or remove officers. Over Mario Taverna's objection, Jule Laudisio and Maricela Fonseca elected Maricela Fonseca to replace Mario Taverna as the new president. The minutes from the February 27 meeting (prepared by Maricela Fonseca) state that Jule Laudisio was a shareholder of Taverna Imports. The minutes also state that Taverna Imports' only directors (and thus the only individuals authorized under the bylaws to elect officers) were Mario Taverna and Maricela Fonseca. Nonetheless, based upon the votes cast by Maricela Fonseca and Jule Laudisio, Maricela Fonseca purportedly was elected to replace Mario Taverna as president of Taverna Imports. Thereafter, Maricela and Richard Fonseca, Jule Laudisio and Hans Eichmann began asserting complete control over Taverna Imports, to the exclusion of Mario Taverna.

On March 23, 2007, Maricela Fonseca issued a "Resolution of Board of Directors of Taverna Imports, Inc.," which she executed as President, Secretary and Treasurer of Taverna Imports. The document purported to ratify the February 27 board meeting as a resolution of the Board of Directors. However, the notice omits reference to any meeting at which the company's Board considered and voted on this resolution. Maricela Fonseca subsequently authored minutes of a shareholder "special meeting," dated April 1, 2007, which reflects a vote for the

6

purpose of electing a new board. The minutes indicate Maricela Fonseca and Jule Laudisio voted for themselves, after which Maricela Fonseca was purportedly elected as president and Jule Laudisio as vice president.

On April 1, 2007, the same day as the "special meeting" described above, Mario Taverna went to Taverna Imports' warehouse, only to discover that the Defendants had changed the locks and had rejected Metro's authority to store inventory there. When Mario Taverna returned to the warehouse the next day, a security guard hired by the Defendants denied Taverna access to the warehouse. Mario Taverna was eventually allowed in, and learned Hans Eichmann was managing the business, and that the Defendants were negotiating to assign the warehouse lease to Metro. The Fonsecas eventually terminated Mario Taverna.

In addition to the above-described events, Mario Taverna and Taverna Imports alleged a series of additional acts of misconduct, all of which culminated in the improper ouster of Mario Taverna and the wrongful takeover and mismanagement of Taverna Imports. Included among them were allegations that Maricela Fonseca, Richard Fonseca, Jule Laudisio and Hans Eichmann, together or individually:

- Forged Mario Taverna's signature on an alcoholic beverage report filed with the Florida Department of Business and Professional Regulation;

7

- Sold numerous cases of wine at far below cost or for no money at all, and thereafter began making payments to, or on behalf of, rival wine distributors;

- Made a wine delivery to a restaurant, during which a waiter, Pablo Monfort, overheard a conversation between Hans Eichmann and the restaurant owner. In that conversation, Hans Eichmann told the owner that if the owner paid Hans Eichmann in cash, the owner would receive a discount, and Hans Eichmann would bill future wine deliveries to the restaurant and invoice them as mineral water;

- After taking over Taverna Imports, the Fonsecas and Jule Laudisio and Hans Eichmann reused various invoice numbers for multiple transactions, thus impeding the company's ability to accurately manage and account for its inventory;

- Categorized inventory they sold off for low cost or no cost as "spoiled," though it was easy to preserve the wine in a proper storage facility, and Hans Eichmann could not explain why other wine distributors would purchase spoiled wine for resale to retail customers;

- Created false invoices and mismanaged accounts receivable by either not recording collected monies or writing them off; and

- Entered and operated side businesses used to export corporate inventory, which resulted in a profit for Hans Eichmann.

Taverna Imports and Mario Taverna asserted that, as a result, Taverna Imports and Mario Taverna suffered damages, including loss of wages and commissions, and a default on corporate lines of credit for which Mario Taverna was a personal guarantor.

## THE LITIGATION

### *Case One: Taverna Imports, Inc. and Mario Taverna v. Maricela Fonseca, Richard Fonseca, Jule Laudisio and Hans Eichmann*

The first round of litigation began in April 2007, when Taverna Imports and Mario Taverna filed suit against Maricela Fonseca, Richard Fonseca, Jule Laudisio and Hans Eichmann. In Count I, Taverna sought damages and declaratory relief alleging that the corporate actions taken by the Defendants subsequent to Jule Laudisio's stock sale were invalid. Count II sought injunctive relief to preclude the Defendants from attempting to manage and control Taverna Imports in a manner contrary to its governing documents. The Defendants filed a counterclaim against Taverna Imports, as well as a third-party complaint against Mario Taverna, individually. Thereafter, Mario Taverna, individually, filed a counterclaim, and he ultimately went forward on a complaint asserting claims against the Fonsecas for breach of fiduciary duty and aiding and abetting the alleged breach of fiduciary duty.

9

Taverna Imports subsequently filed a motion for partial summary judgment as to Count I of its complaint, seeking a declaratory judgment as to the validity of Jule Laudisio's 2007 stock sale, as well as the invalidity of corporate acts taken by the Defendants after the stock sale. The court ultimately granted summary judgment on these issues by order entered on April 1, 2010, determining that the January 26, 2007 stock sale of Jule Laudisio's ten percent interest back to Taverna Imports was valid; that Jule Laudisio was no longer a shareholder after the date of that sale; that the shareholders' meeting of February 27, 2007 and the subsequent meetings and the votes taken, including those purporting to elect a new president of Taverna Imports, were invalid; and that Mario Taverna continued to be the lawful president of Taverna Imports.

Case One was tried in September 2014. Based on the 2010 partial summary judgment, the court instructed the jury:

> This court has already determined that: One, the January 26, 2007 stock sale of Jule Laudisio's 10 percent back to Taverna Imports was valid. Two, the shareholder's meeting on February 27, 2007 and the subsequent shareholders' and directors' meeting purporting to elect a new president of Taverna Imports, Inc. were invalid. Accordingly, Mario Taverna continued to be president of Taverna Imports, Inc. in 2007.

At trial, Mario Taverna presented the testimony of Pablo Monfort, whom the Defendants characterize as a "surprise" witness. Monfort was working as a waiter at a restaurant when he overheard a conversation between Eichmann and the

10

restaurant owner regarding paying invoices in cash and invoicing future sales under Eichmann's own company. The following day, Monfort sent a letter to Mario Taverna, detailing the conversation he overheard. Monfort was not included by name on the pretrial witness list,[4] nor had he been deposed before trial. However, the letter Monfort sent to Mario Taverna was listed on an exhibit list, had been produced in discovery, and its contents had been discussed during discovery depositions, including the deposition of Hans Eichmann.

The Defendants objected to the admission of the letter (based on hearsay) and further objected to Monfort testifying at trial (based upon procedural prejudice from Taverna's failure to list Monfort as a witness). The court instructed the Defendants to depose Monfort during a recess in the trial, which they did. The trial court eventually permitted Monfort to testify, and his testimony was limited to the conversation he overheard, as described in the letter he had sent to Mario Taverna. The trial court also admitted the Monfort letter.

At the close of the evidence, the jury returned a verdict in favor of Mario Taverna and Taverna Imports and against the Defendants on all claims, finding Maricela Fonseca and Hans Eichmann "wrongfully [took] corporate authority of Taverna Imports, Inc., which caused damages to Taverna Imports, Inc.," and that Richard Fonseca and Jule Laudisio aided and abetted in the wrongful taking of

---

[4] Taverna had listed an unidentified "records custodian" for the letter written by Monfort.

11

corporate authority. The jury also found Maricela Fonseca breached the fiduciary duty she owed to Mario Taverna, thereby causing him damages, and that Richard Fonseca aided and abetted in that breach.

On September 14, 2014, the jury awarded $1,063,234 to Taverna Imports, and $833,000 to Mario Taverna, individually. The Defendants claim Mario Taverna only sought $29,602.32 for his liability for corporate debt, yet the jury awarded him $285,000 on that claim, as well as $548,000 for "[l]ost wages and commissions."

The Defendants timely filed post-trial motions, seeking directed verdicts and, in the alternative, a new trial, new trial on damages, or remittitur. Following a hearing, the trial court denied all post-trial motions. The trial court entered separate judgments in favor of Taverna Imports and Mario Taverna, and against all Defendants, jointly and severally, in Case One.

In connection with Case One, the Defendants assert the following points on appeal: (1) the trial court's order granting partial summary judgment, based upon its determination that Taverna Imports validly repurchased Jule Laudisio's ten percent stock interest in Taverna Imports and that Mario Taverna was *not* validly removed as president in February of 2007; (2) the jury's verdict in favor of Taverna Imports and Mario Taverna, and the subsequent final judgments, awarded damages based on legally invalid claims and include damages that were unpled,

12

speculative and legally excessive; and (3) the trial court erroneously permitted Mario Taverna and Taverna Imports to present the testimony of Pablo Monfort, an unlisted witness, and to introduce his letter, which contained rank hearsay.

### *Case Two: Richard Fonseca v. Taverna Imports*

In addition to the foregoing, there is a competing judgment in a second lower court case, arising out of the same core events leading to the litigation in Case One.

In Case Two, Bank of America filed suit against Taverna Imports in 2007 when it defaulted on its credit line. In 2008, Bank of America obtained a default judgment for $110,309.36, around the same time that Maricela Fonseca was alleged to have wrongfully taken control of Taverna Imports. For more than six years, Bank of America took no action to collect upon that judgment.

On June 16, 2014, Richard Fonseca purchased the Bank of America judgment.[5] Richard Fonseca subsequently filed a motion to be substituted as the party plaintiff in Case Two, which was granted. He then sought to execute on shares of stock that Taverna Imports had purchased from Jule Laudisio in June 2005.[6]

---

[5] By this time, in Case One, the trial court had already granted partial summary judgment in favor of Mario Taverna and Taverna Imports, and a September 2014 trial date was looming to resolve the remaining aspects of Case One. As discussed, that trial concluded on September 12, 2014, with a jury verdict in favor of Mario Taverna and Taverna Imports.

[6] Richard Fonseca's motion sought to levy and execute only upon the 1000 shares

On September 16, 2014, the lower court granted Richard Fonseca's motion to execute and levy on the stock shares[7] and entered a more specific order the following day. Taverna Imports appealed both orders.

Between the August hearing date on Richard Fonseca's motion and the September order granting Richard Fonseca's motion to execute and levy on the stock shares in Case Two, Case One was tried with a resulting verdict in favor of Taverna Imports and Mario Taverna, as previously discussed. Thus, the outstanding judgments from the two cases which form the bases for these appeals, are as follows:

- **Case One:**

    o $1,063,234 in favor of Taverna Imports against Richard Fonseca, Maricela Fonseca, Jule Laudisio and Hans Eichmann, jointly and severally; and

    o $833,000 in favor of Mario Taverna, individually, against Richard Fonseca, Maricela Fonseca, Jule Laudisio and Hans Eichmann, jointly and severally

- **Case Two:**

---

repurchased by Taverna Imports from Jule Laudisio in 2005, and did not seek to levy on the remaining 500 shares, given Fonseca's position throughout the litigation (and here on appeal) that Jule Laudisio never validly sold, and Taverna Imports never validly purchased, Jule Laudisio's remaining 500 shares.

[7] Only four days earlier, on September 12, 2014, the trial in Case One concluded with a jury verdict against Richard Fonseca and in favor of Taverna Imports (for $1,063,234) and Mario Taverna (for $833,000). Case One and Case Two proceeded in two different divisions, before two different judges.

14

- $110,309.36 in favor of Richard Fonseca against Taverna Imports; and

- $180,907.92 in favor of Richard Fonseca against Mario Taverna.[8]

On September 23, 2014, eleven days after the Case One verdict in favor of Taverna Imports and Mario Taverna, Taverna Imports filed its "Motion for Relief from Judgment and Motion for Relief from an Order and a Motion to Stay Execution of Judgments Based Upon New Evidence and Equity," in which it moved for relief from the judgments obtained by Richard Fonseca in Case Two, and from the September 16, 2014 order granting Richard Fonseca's motion to subject stock to execution and levy. Taverna Imports based its motion on Florida Rule of Civil Procedure 1.540(b), alleging that new evidence—specifically, the intervening verdict and judgment entered in Case One—should relieve it from the judgments in Case Two. Taverna Imports also sought a stay of execution of all the judgments against Taverna Imports until a transfer judge could rule on a pending motion to transfer Case Two to the division where Case One was pending

---

[8] In addition to purchasing the Bank of America judgment against Taverna Imports, Richard Fonseca also purchased Bank of America's judgment against Mario Taverna, in the amount of $180,907.92. However, the issue raised in the appeal of Case Two concerns only whether Richard Fonseca should be permitted to collect on the judgment against Taverna Imports by levying upon its stock. Our decision in Case Two is therefore limited to the competing judgments between Richard Fonseca and Taverna Imports. And while Mario Taverna has filed, in the trial court, a motion seeking similar offset treatment of his competing judgments for and against Richard Fonseca, such requested relief is beyond the scope of this appeal.

15

and until that court could rule on a motion to offset the judgments pending in Case One. These motions were denied. Taverna Imports contends on appeal that the trial court erred in permitting Richard Fonseca to subject the repurchased stock to execution and levy, and contends that the trial court should have granted the motion for relief from judgment and offset the competing judgments between Fonseca and Taverna Imports.[9]

## ANALYSIS

### *Case One: Partial Summary Judgment*

The Defendants first contend that the lower court erred in granting summary judgment as to Count I of Taverna Imports' complaint for declaratory relief. We review this issue de novo. Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So. 2d 126 (Fla. 2000).

The issue is whether the corporate actions taken by the Defendants at the shareholders' meeting of February 27, 2007 and thereafter (which actions included removing Mario Taverna as president) were valid or invalid. The answer to this question turns upon whether Taverna Imports validly repurchased Jule Laudisio's remaining 500 shares on January 26, 2007.

---

[9] Taverna Imports also appealed the trial court's order denying stay of execution. However, the appeal of that order was mooted by this court's subsequent order granting a stay during the pendency of these consolidated appeals.

16

The Defendants first contend that there was no sale and no valid agreement because Mario Taverna never executed it. The agreement was contained in a January 26, 2007 letter written by Mario Taverna to Jule Laudisio, by which Laudisio would sell her shares back to Taverna Imports for $5,000.

The letter agreement provided:

Dear Jule,

Taverna Imports is purchasing your 10% option[10] that you are holding for purchase of Taverna Imports, Inc shares for $5000.00 on this day, Friday, January 26, 2007.

Although Mario Taverna did not sign the letter, Jule Laudisio did sign and notarize the agreement. Following Jule Laudisio's execution of the agreement, Mario Taverna, on behalf of Taverna Imports, tendered two checks to Jule Laudisio in consideration for her shares. Jule Laudisio testified in her deposition that she had agreed to the stock transaction and had accepted both checks as full consideration.

It is well established that mutuality of assent can be shown by conduct rather than signature. Integrated Health Servs. of Green Briar, Inc. v. Lopez-Silvero, 827 So. 2d 338, 339 (Fla. 3d DCA 2002). In Lopez-Silvero, this Court held

A contract is binding, despite the fact that one party did not sign the contract, where both parties have performed under the contract. See

---

[10]This is a reference to the two-year stock option agreed upon by Laudisio and Taverna Imports in June of 2005 when Taverna Imports had repurchased 1000 of Laudisio's 1500 shares.

17

Gateway Cable T.V., Inc. v. Vikoa Construction Corp., 253 So.2d 461 (Fla. 1st DCA 1971). As noted in Gateway Cable T.V., Inc. v. Vikoa Construction Corp., 253 So.2d at 463, "A contract may be binding on a party despite the absence of a party's signature. The object of a signature is to show mutuality or assent, but these facts may be shown in other ways, for example, by the acts or conduct of the parties." See also Sosa v. Shearform Mfg., 784 So.2d 609 (Fla. 5th DCA 2001) (parties may be bound to the provisions of an unsigned contract if they acted as though the provisions of the contract were in force.)

Id.

The Defendants also contend that one of the checks was post-dated, thereby altering the terms of the agreement. However, Jule Laudisio never objected to, nor voiced any concerns about, the post-dated check. A party's failure to object to the manner of acceptance as being inconsistent with the terms of the agreement, operates as a waiver. Caldwell v. Snyder, 949 So. 2d 1048 (Fla. 3d DCA 2006); Bush v. Ayer, 728 So. 2d 799, 802 (Fla. 4th DCA 1999).

Further, the fact that Jule Laudisio sent the un-negotiated checks back to Mario Taverna did not serve to invalidate the agreement. See Carman v. Gunn, 198 So. 2d 76 (Fla. 2d DCA 1967)(reversing trial court's denial of specific performance notwithstanding that seller refused to cash buyer's monthly checks tendered pursuant to contract). We find Defendants' remaining arguments on this issue unavailing, and hold that the trial court properly concluded that there were no genuine issues of material fact and that, as a matter of law, Jule Laudisio had validly sold her shares of Taverna Imports back to Taverna Imports.

18

We further conclude that the trial court properly determined that Jule Laudisio was not a director of Taverna Imports, a finding necessary to the trial court's ultimate determination that Mario Taverna was not validly removed as president of Taverna Imports, an act which requires a majority vote of its Board of Directors. The only directors of Taverna Imports present and voting at the shareholders' meeting on February 27, 2007 were Mario Taverna and Maricela Fonseca.[11] The minutes of the February 27 meeting (prepared by Maricela Fonseca) do not list Jule Laudisio as a director, instead listing her only as a shareholder. Jule Laudisio herself testified at her deposition that the only position she ever held for Taverna Imports was that of vice president. There was no genuine issue of material fact in this regard. As Taverna Imports' bylaws mandate that officers may be elected and removed only by a majority vote of the Board of Directors, none of the corporate acts undertaken at that meeting can be deemed valid as none of the acts was supported, as required, by a majority vote of the Board. Therefore, we affirm the lower court's entry of partial summary judgment on the claim for declaratory relief in Case One.

---

[11] Taverna Imports' 2007 annual report lists Janelle Hertz as a third director. She was not present at the meeting nor did she cast a vote. The Defendants contend Hertz was never validly selected as a director. Even if this is true, it is also irrelevant. Under the bylaws, Maricela Fonseca could not be elected to replace Mario Taverna as president except by a majority vote of the Board of Directors. Whether there were two directors or three directors at the time of the vote, two votes were required to be cast in favor of his removal as president, and only one valid vote in favor was cast.

***Case One: Mario Taverna's individual claims against Maricela Fonseca and Richard Fonseca***

The jury returned a verdict in favor of Mario Taverna (and against Maricela Fonseca and Richard Fonseca) in a total amount of $833,000. This amount was comprised of damages for "lost wages and commissions" ($548,000) and "personal liability for corporate debt" ($285,000). Judgment was entered in the total amount. The verdict reflects that the jury found Maricela Fonseca breached a fiduciary duty she owed to Mario Taverna and that Richard Fonseca aided and abetted Maricela Fonseca's breach of that fiduciary duty, resulting in the damages set forth above.

*a) Breach of Fiduciary Duty by Maricela Fonseca*

We find that Mario Taverna sufficiently pleaded that Maricela Fonseca owed a fiduciary duty to Mario Taverna and "deliberately, willfully, intentionally and maliciously, without justification, privilege or authority, improperly and wrongfully" breached her fiduciary duty. See § 607.0830, Fla. Stat. (2007) (providing that a director shall discharge his or her duties as a director in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believes to be in the best interests of the corporation); § 607.0831 (providing, inter alia, that a director is not personally liable for monetary damages to the corporation or any other person unless the director breached or failed to perform her duties and the breach or failure to perform constitutes recklessness or an act or omission which

20

was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property) (emphasis added). A review of the record establishes that there was competent substantial evidence to support the jury's determination that Maricela Fonseca's malicious and willful misconduct constituted a breach of her fiduciary duty, resulting in individual losses suffered by Mario Taverna, for which Maricela and Richard Fonseca were liable. See Camper Corral, Inc., v. Perantoni, 801 So. 2d 990 (Fla. 2d DCA 2001).

### b) Aiding and Abetting Breach by Richard Fonseca

The pleading and the proof at trial also supported the jury's determination that Richard Fonseca aided and abetted Maricela Fonseca's breach of fiduciary duty. Florida law recognizes a cause of action for aiding and abetting the breach of a fiduciary duty. See Ft. Myers Dev. Corp. v. J.W. McWilliams Co., 122 So. 264 (Fla. 1929); NHB Advisors, Inc. v. Czyzyk, 95 So. 3d 444 (Fla. 4th DCA 2012); Nerbonne, N.V. v. Lake Bryan Intern. Props., 689 So. 2d 322 (Fla. 5th DCA 1997); AmeriFirst Bank v. Bomar, 757 F. Supp. 1365 (S.D. Fla. 1991). A cause of action for aiding and abetting the breach of a fiduciary duty requires a plaintiff to establish: 1) a fiduciary duty on the part of a primary wrongdoer; 2) a breach of that fiduciary duty; 3) knowledge of the breach by the alleged aider and abettor; and 4) the aider and abettor's substantial assistance or encouragement of the

21

wrongdoing. Arbitrajes Financieros, S.A. v. Bank of America, N.A., 605 Fed. Appx. 820, 824 (11th Cir. 2015); Hearn v. McKay, 642 F. Supp. 2d 1330 (S.D. Fla. 2008), aff'd 603 F. 3d 897 (11th Cir. 2010). The jury's determination that Richard Fonseca aided and abetted his wife, Maricela Fonseca, in her breach of fiduciary duty, is supported by competent substantial evidence presented at trial. By aiding and abetting Maricela Fonseca's breach, Richard Fonseca was likewise liable for the resulting damages. Nerbonne, N.V., 689 So. 2d at 325.

### c) Damages Caused by the Breach of Fiduciary Duty

We reject the Fonsecas' argument that Mario Taverna's claim for damages for lost wages and commissions should have been sought against Taverna Imports rather than against the Fonsecas. Mario Taverna's cause of action sounded in tort and not in contract, and the evidence at trial supported Mario Taverna's claim that the willful and malicious misconduct of Marisela Fonseca and of Richard Fonseca (as aider and abettor), in improperly usurping corporate control and ousting Mario Taverna, caused these damages. We affirm the jury's award of $548,000 to Mario Taverna, as damages suffered by him individually as a result of the breach of fiduciary duty. Perantoni, 801 So. 2d at 990.

However, the jury also awarded Mario Taverna, as damages caused by the breach of fiduciary duty, $285,000 for "personal liability for corporate debt." We agree with the Defendants that this amount of damages is not supported by

22

competent substantial evidence. The $285,000 total purportedly represented two judgments obtained against Mario Taverna, after Taverna Imports defaulted on two separate lines of credit, for which Mario Taverna signed personal guaranties. One judgment was in favor of Wachovia Bank ($29,602.32) and the other in favor of Bank of America ($180,907.92). The evidence at trial established damages only for the Wachovia judgment, in the amount of $29,602.32. There was no evidence supporting Mario Taverna's entitlement to damages for the Bank of America judgment. Indeed, Mario Taverna's own counsel, during closing argument, requested damages only for the Wachovia judgment, and did not ask the jury to award damages for the Bank of America judgment. Furthermore, the trial court's instruction, given without objection by Mario Taverna, advised the jury that the only damages it could consider in this regard was "the personal liability <u>for the corporate debt with Wachovia Bank</u>." (Emphasis added.) Nevertheless, the jury awarded damages well in excess of the Wachovia judgment, and those damages inarguably included the Bank of America judgment. We reverse and remand on this portion of the judgment for entry of an amended judgment. [12]

---

[12] We recognize that the combined amount of the two judgments equals only $210,510.24, which is substantially less than the total amount of damages awarded by the jury for personal liability for corporate debt ($285,000). However, the only competent substantial evidence introduced at trial on this aspect of the damages supports an award solely for the amount of the Wachovia judgment ($29,602.32). Therefore, on remand, the trial court shall enter an amended judgment reflecting a reduction of $255,397.68 in the total judgment ($285,000- $29,602.32).

## *Case One: Admission of Monfort Letter and Testimony*

The lower court did not abuse its discretion in admitting the testimony of Pablo Monfort and in admitting the letter he had written and sent to Mario Taverna. Monfort was an employee of a restaurant that did business with Taverna Imports. The thrust of Monfort's testimony was limited to describing a 2007 conversation he overheard between the owner of the restaurant and defendant Hans Eichmannn. The day after Monfort overheard this conversation, he sent a letter to Mario Taverna, describing the conversation.[13] Although Taverna had not listed Monfort as a witness, Monfort's letter was listed as an exhibit and was produced during discovery. The Monfort letter and its contents were well known to the Defendants and had been addressed during discovery depositions, including the deposition of Hans Eichmannn.[14]

---

[13] Monfort's testimony regarding the statements he overheard Hans Eichmann make to the restaurant owner were admissible as statements of a party opponent. See § 90.803(18) (authorizing admission of a statement "that is offered against a party and is. . . [t]he party's own statement in either an individual or a representative capacity").

[14] Monfort's letter to Mario Taverna read:

Dear Mr. Taverna:

Yesterday, October 18, [2007] while I was working at Vito's Restaurant in Key Biscayne something wrong happened that you should know. I believe someone is delivering your wine and taking your money. This is what happened, Hans (I do not remember his last name, but I meet him in your office at Taverna Imports), he was making deliveries when Vito's was going to pay, he suggested to Vito if he pay cash, he will give him a discount, Vito agreed but told him

Sometime after 2007, Monfort left Miami and was in Ecuador, and Taverna was no longer able to contact him. Believing that Monfort would not be within the jurisdiction or available for trial, he was not listed as a witness. Shortly before trial, however, Taverna discovered Monfort had returned to Miami and, during trial, Taverna indicated he intended to call Monfort as a "records custodian" seeking admission of this 2007 letter.

Prior to making a decision regarding admission of Monfort's testimony, the trial court instructed the Defendants to depose Monfort, which they did. The trial court properly followed the guidelines established in <u>Binger v. King Pest Control</u>, 401 So. 2d 1310 (Fla. 1981).[15] There was no evidence of bad faith or intentional

<hr>

that because he did not have enough cash he could write him a check to cash if it was ok with him, Hands [sic] agreed and Vito wrote the check #4655 (Citybank) for $189.00 to cash, after this Hans told Vito to destroy and throw away the invoice.

After this, I overhear Hans telling Vito from now on "I will invoice your wine as Mineral Water under my own company."

Mr. Taverna you have problems and you should look into this for your own good. Any question about this feel free to contact me at my cellular phone [phone number redacted].

Sincerely,
Pablo Monfort

[15] In <u>Binger</u>, 401 So. 2d at 1314, the Florida Supreme Court held:

[A] trial court can properly exclude the testimony of a witness whose name has not been disclosed in accordance with a pretrial order. The discretion to do so must not be exercised blindly, however, and should be guided largely by a determination as to whether use of the undisclosed witness will prejudice the objecting party. Prejudice in

25

noncompliance on the part of Taverna. Any procedural prejudice was minimal, especially in light of the fact that Monfort's testimony was limited to a single conversation, the contents of which were detailed in a letter which had been disclosed to Defendants and utilized by the parties during pretrial discovery. Further, the Defendants were given an opportunity to depose Monfort before he testified at trial. We find no abuse of discretion in the trial court's determinations or in its decision to permit Monfort to testify. Given that the trial court properly permitted Monfort to testify to this conversation, we find that any error[16] in admission of the letter itself, over a hearsay objection, was harmless.

this sense refers to the surprise in fact of the objecting party, and it is not dependent on the adverse nature of the testimony. Other factors which may enter into the trial court's exercise of discretion are: (i) the objecting party's ability to cure the prejudice or, similarly, his independent knowledge of the existence of the witness; (ii) the calling party's possible intentional, or bad faith, noncompliance with the pretrial order; and (iii) the possible disruption of the orderly and efficient trial of the case (or other cases). If after considering these factors, and any others that are relevant, the trial court concludes that use of the undisclosed witness will not substantially endanger the fairness of the proceeding, the pretrial order mandating disclosure should be modified and the witness should be allowed to testify.

[16] We note, however, that the letter appears to be admissible as non-hearsay, to rebut an implied charge of improper influence, motive, or recent fabrication. See § 90.801(2)(b), Fla. Stat. (2014) (providing that a statement is not hearsay "if the declarant testifies at trial or hearing and is subject to cross-examination and the statement is. . . [c]onsistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of improper influence, motive, or recent fabrication. . . ."); Fleitas v. State, 3 So. 3d 351 (Fla. 3d DCA 2008). On cross-examination, Defendants questioned Monfort's ability to recall the details of a conversation he ostensibly overheard seven years earlier. Also during cross-

As to the remaining issues raised by the Defendants in Case One, we find them to be without merit and warrant no further discussion.

### *Case Two: Richard Fonseca's Attempt to Execute and Levy Upon Shares Repurchased by Taverna Imports*

The appeal from Case Two is centered upon Richard Fonseca's motion to subject certain Taverna Import stock to execution and levy. After buying Bank of America's judgment and being substituted as the party plaintiff in the instant case, Richard Fonseca moved to execute and levy upon the 1000 shares that Taverna Imports repurchased from Jule Laudisio in 2005.

Taverna Imports contends that Richard Fonseca should not be permitted to execute or levy upon these shares for the singular and improper purpose of seizing majority control of the corporation, thereby giving Richard Fonseca (together with his wife, Maricela Fonseca) the power to extinguish Taverna Imports' million-dollar judgment obtained in Case One against Maricela and Richard Fonseca, which is the only significant corporate asset.[17] We agree, and hold that, in light of

examination, Monfort was asked about his relationship with Mario Taverna, and Monfort acknowledged that he had recently contacted Mario Taverna, asking for Taverna's help in getting Monfort a job at a restaurant in Miami where Taverna's brother was employed. On redirect, Taverna sought to introduce the Monfort letter, which was admitted over a hearsay objection. The letter served to rebut the implication created during cross-examination, by establishing that Monfort had made a prior consistent statement "before the existence of a fact said to indicate bias, interest, corruption or other motive to falsify the prior consistent statement." Taylor v. State, 855 So. 2d 1, 23 (Fla. 2003).

[17] Taverna Imports also contends that, upon its repurchase of Laudisio's stock,

27

the circumstances presented in this case, the trial court abused its discretion in permitting the shares to be levied and executed upon, as executing on this stock would serve no other purpose than permitting the Fonsecas to seize majority control of Taverna Imports, as a means of extinguishing their status as judgment debtors of Taverna Imports. The trial court, under the circumstances and conditions presented, should have denied Richard Fonseca's motion to execute and levy, and should have instead applied Richard Fonseca's judgment against Taverna Imports in Case Two (in the amount of $110,309.36) as an offset to Taverna Imports' judgment against Richard Fonseca in Case One ($1,063,234).

The timeline of events is important to our consideration of this issue:

**2007**: Bank of America sues Taverna Imports after Taverna Imports defaults on its credit line (Case Two);

**September 2008**: Bank of America obtains a final judgment against Taverna Imports in Case Two for $110,309.36;

**2008**: During the same time, Maricela Fonseca was alleged to have wrongfully taken control of Taverna Imports, aided and abetted by her husband, Richard Fonseca;

---

those 1000 shares became "authorized but unissued" corporate stock and, as such, were not a corporate asset and were not subject to execution and levy. See § 607.0631(1), Fla. Stat. (2007) (providing in pertinent part that "[a] corporation may acquire its own shares. . . and. . . shares so acquired constitute authorized but unissued shares of the same class but undesignated as to series") (emphasis added). Given our disposition of the issue on alternative grounds, we decline to reach the issue of whether the shares repurchased by Taverna Imports constitute an asset of the corporation subject to execution and levy.

28

**September 2008- June 2014**: Bank of America takes no record action to collect upon the judgment in Case Two;

**June 16, 2014**: Richard Fonseca purchases the Bank of America judgment entered against Taverna Imports in Case Two;

**June 26, 2014**: The trial court grants Richard Fonseca's motion to be substituted as the party plaintiff in Case Two;

**August 8, 2014**: Richard Fonseca files a motion in Case Two to authorize execution on the stock shares that Taverna Imports had repurchased from Jule Laudisio;

**September 8, 2014**: Trial begins in Case One (Taverna Imports, et al. v. Maricela and Richard Fonseca, et al.);

**September 12, 2014**: Jury returns a verdict in Case One in favor of Taverna Imports and against Maricela and Richard Fonseca (and others) for $1,063,234;

**September 16, 2014**: Trial court in Case Two grants Richard Fonseca's motion to execute and levy on the stock shares;

**September 23, 2014**: Eleven days after the Case One verdict in favor of Taverna Imports and against Maricela and Richard Fonseca, Taverna Imports files in Case Two its "Motion for Relief from Judgment and Motion for Relief from an Order and a Motion to Stay Execution of Judgments Based Upon New Evidence and Equity." Taverna Imports contended that, under the circumstances, it would be inequitable to permit Richard Fonseca to collect on this judgment by levying on the shares repurchased from Jule Laudisio, and that the court should instead order an offset of the competing judgments. Mario Taverna joins in this motion. The trial court subsequently denies the motion.[18]

---

[18] It should be noted that a similar motion for relief from judgment under rule 1.540(b) was filed in Case One. That motion was set for hearing on March 12, 2015, after the appeals from these judgments were already pending in this court. At the March 12 hearing, the trial court indicated its intent to grant the motion for relief, which would have offset the competing judgments, but would have necessarily resulted in a modification of the underlying judgments. The Fonsecas

The corporate viability of Taverna Imports during this time period is also significant: at the time that Richard Fonseca purchased the Bank of America judgment, and during the time he sought to levy upon the shares repurchased from Jule Laudisio, Taverna Imports was no longer an ongoing concern. It was generating no revenue, had no inventory, and its only asset of significance was the $1,063,234 judgment it had secured in Case One against Richard Fonseca, Maricela Fonseca and others, jointly and severally. Richard Fonseca offered no legitimate business purpose for seeking to satisfy his $110,309.36 judgment against Taverna Imports by executing on these shares of Taverna Imports. But if successful in doing so, Richard Fonseca and his wife, Maricela Fonseca, would together own a majority of the shares of Taverna Imports, and through their majority control would have the power to negate their status as judgment debtors of Taverna Imports by extinguishing the million-dollar judgment which Taverna Imports had obtained against the Fonsecas.

In <u>Rowland v. Times Publishing Co.</u>, 35 So. 2d 399 (Fla. 1948), stockholders of a corporation disagreed on whether to convert the building they

filed a petition with this court, (3D15-912) asserting that the trial court was without jurisdiction to modify judgments which were the subject of a pending appeal. We granted the petition for writ of prohibition. <u>See</u> <u>Fonseca v. Taverna Imports, Inc.</u>, 193 So. 3d 92 (Fla. 3d DCA 2016). And while we have, by this opinion, ultimately determined that the intended action by the trial court would have been the sound and proper one, even the most well-intended act cannot validly be effectuated in the absence of jurisdiction.

owned into a department store. The corporation's directors (the minority shareholders), were in favor of this effort and, to resolve the dispute, they issued and delivered 325 previously unissued shares of the corporation to a third party who was favorable to their interests and intentions. The trial court framed the relevant question as whether the "transfer of so-called unissued stock or trustees' stock made under such circumstances and conditions" rendered the transaction invalid or illegal. Id. at 401. It found the actions invalid and cancelled the transfer of the unissued stock. The Supreme Court affirmed, citing to a decision from the Wisconsin Supreme Court in Luther v. C.J. Luther Co., 94 N.W. 69 (Wis. 1903), which involved a similar question:

> The directors as minority stockholders caused to be sold 'unissued stock' of the corporation for the purpose of placing in friendly hands the power to vote the shares favorable to the corporate policy advocated by them and thereby render the opposite faction a minority group of stockholders in the corporation. The 'unissued stock' was considered as subject to the control of the directors, like other property or assets of the corporation, and to sell at prices most favorable to all the stockholders of the corporation, in the honest exercise of the discretion and trust vested in them. Their duty with reference thereto is fiduciary; they are bound to act in the best of faith for all stockholders. To dispose of or manage property of the corporation to the end or for the purpose of giving to one part of the cestuis que trustent a benefit or advantage over, or at the expense of, another part, is a breach of duty, especially when the directors belong to the benefited class.

Rowland, 35 So. 2d at 402 (quoting Luther, 94 N.W. at 73). See also Biltmore Motor Corp. v. Roque, 291 So. 2d 114 (Fla. 3d DCA 1974)(finding that the

purpose for recapitalizing a company was to oust the plaintiff as a stockholder, and holding "no legitimate business purpose for the directors' action was shown and . . . their action constitutes an abuse of discretion and a violation of their fiduciary duty to the plaintiff.")

Though the *means* employed here may differ from those employed in Rowland (sale of unissued shares) the ends remain the same: such an event or transaction should not be permitted where its objective or result is the seizing of corporate control for an improper purpose. As the Rowland court observed: "It cannot matter how this result is accomplished, nor what the form of the undue benefits conferred or acquired." Rowland, 35 So. 2d at 402. The trial court's order subjecting the shares to levy and execution would undeniably enable Richard and Maricela Fonseca to seize majority ownership and control of Taverna Imports. As such, they would have the power to wipe out Taverna Imports' million-dollar judgment against the Fonsecas, the only substantial asset of a now-defunct corporation. Such an improper and inequitable purpose should not be sanctioned; this is especially true in the instant case, given the equitable alternative of offsetting Richard Fonseca's judgment in Case Two against Taverna Imports' judgment in Case One.

We therefore reverse the trial court's order denying Taverna Imports' motion for relief from the order authorizing execution and levy, and remand with

directions that Richard Fonseca's judgment in Case Two ($110,309.36) be applied as an offset against Taverna Imports' judgment in Case One ($1,063,234).

Affirmed in part, reversed in part, and remanded with directions.