# Third District Court of Appeal

## State of Florida

Opinion filed December 10, 2018.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D16-2869
Lower Tribunal No. 11-29068
_____

**James White and Theresa White,**
Appellants,

vs.

**Ring Power Corp.,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Rosa I. Rodriguez, Judge.

William C. Robinson, for appellants.

Akerman, LLP, Katherine E. Giddings (Tallahassee), Michael J. Larson (Tallahassee) and Gerald B. Cope, Jr., for appellee.

Before ROTHENBERG, C.J., and EMAS and LUCK, JJ.

PER CURIAM.

**INTRODUCTION**

James White, an employee of Miami-Dade County Transit Authority, was injured while using a crane that Miami-Dade Transit rented from Ring Power Corporation. White was attempting to use the crane to lift a derailed Metro Mover train car and place it back on the tracks. When the wire rope on the crane snapped, the 400-pound "headache ball"[1] (which was attached to the wire rope) fell on White's leg. White sued Ring Power and others for negligence, and the case proceeded to trial against Ring Power only.

The jury returned a verdict in favor of Ring Power, and White appeals, contending: (1) the trial court abused its discretion in excluding certain expert witness testimony offered to support his claim that data from the crane's load moment indicator (LMI)[2] showed prior overloads to the crane, which weakened the integrity of the wire rope, causing it to snap on the day of the accident; (2) the trial court erred in determining (and instructing the jury) that Ring Power did not have a duty to download the crane's LMI data before renting it to Miami-Dade Transit;

_____

[1] As described by witnesses at trial, a "headache ball" is a round steel weight with a single hook under it, used to connect the load to the crane and lift the load. The weight of the ball is sized so there is a certain amount of tension always on the wire rope or cable. The ball, in other words, keeps the tension on the line.

[2] An LMI warns the operator if a load is being lifted in a dangerous way. The LMI monitors several factors, including allowable load, actual load, boom angle, and boom length. When a load is unsafe, it activates an alarm and the crane shuts down. The LMI's data event recorder records this information, including "overloads" to the crane.

and (3) the trial court erred in admitting certain defense expert testimony, which White contends constituted new opinions that both surprised and prejudiced White. Each of these errors, White argues, requires a new trial. For the reasons that follow, we affirm.

## BACKGROUND AND PROCEDURAL HISTORY

### a. The Accident

At the time of the accident, James White was chief shop supervisor at the Lehman train yard, where Metro Mover trains are brought for servicing and maintenance. Miami-Dade Transit rented the subject crane from Ring Power on June 24, 2011. On July 14 (three days before the accident), Miami-Dade Transit employees were using the crane and noticed the wire rope spooled on the drum was cross-braided instead of being "neatly wrapped around the drum" as it should have been. The employees filed reports and notified supervisors of the defective equipment, but the crane was not taken out of service.

On the day of the accident (and three weeks after Miami Dade Transit rented the crane), one of the train cars derailed while in the Lehman train yard. White was called to help re-rail the train. Instead of using a pneumatic jack, workers used the crane to try and lift the train and set it back onto the track. The train car weighed 75,000 pounds. The back portion of the train—the portion the workers were trying to lift—weighed about 36,000 pounds. The lifting capacity of the crane

3

depends on whether it is configured to use "single-part line," or "multiple parts line." Each added line increases the crane's lifting ability.[3] Although the crane was capable of being configured to a "four-part line," which would enable it to lift 42,000 pounds, White configured the crane to a single-part line, capable of lifting up to 11,640 pounds.

Workers attempted on five occasions to use the crane to lift and re-rail the train. But on each attempt, the crane shut down. On the fifth and final attempt, the wire rope snapped, and the 400-pound headache ball landed on White's leg, causing serious injury and ultimately requiring amputation of White's leg above the knee.

### b. The Lawsuit

In September 2011, White filed suit against the crane manufacturer, the manufacturer's subsidiary, the wire rope manufacturer, and the crane lessor (Ring Power). By the time of trial, White had settled with all defendants except Ring Power, on a remaining claim for negligence.[4] White alleged that Ring was

---

[3] An expert witness explained: "[I]f you wanted to pick [up] something that exceeded 11,600 pounds, you would need more than one-part line, so you would use a hook block with multiple sheaves, and you would take the rope and you would rivet through the additional sheaves and back up through the additional sheaves on the bottom of the boom, and you could – and you could increase the part of the line to, on that model, I think up to at least six parts."

[4] Theresa White, the wife of James White, was also a party-plaintiff, seeking damages on a derivative claim for loss of consortium. For ease of reference, we refer to appellants collectively as "White".

4

negligent in failing to properly inspect and replace the wire rope on the crane before renting it to Miami-Dade Transit, and that previous overloads to the crane diminished the wire rope's integrity, causing it to snap. Ring Power contended that the wire rope snapped due to the workers' failure to properly inspect the wire rope, take the crane out of service when they discovered cross-braiding of the wire rope, and heed the system's warnings and shutdowns during the attempted lift.

*c. Pretrial Motions*

White retained three experts to opine on the cause of the wire rope snapping: Tom Barth (certified marine crane inspector for the federal government); Lew Barbe (engineer with crane experience)[5]; and William Mankins (metallurgist). After the witnesses were deposed, Ring Power filed a motion to strike the experts' testimony pursuant to section 90.702, Florida Statutes (2015) (the Daubert[6] standard). Following a hearing, the trial court excluded a portion of the three expert witnesses' proposed testimony, precluding these three experts from interpreting and offering opinions about the data collected and recorded by the crane's load moment indicator.

The trial court found that none of the three experts was qualified to interpret the LMI data and to offer opinions whether the crane was actually overloaded at

---

[5] White withdrew Barbe as an expert a year before the trial. Barbe's testimony was not proffered, nor was he called to testify at the trial.
[6] Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

some time prior to the crane being rented to Miami-Dade Transit. The trial court's exclusion of this testimony was based in part on the deposition testimony of White's own experts that they each lacked knowledge of and familiarity with LMI data and LMI systems.

Prior to trial, Ring Power filed a motion for partial summary judgment on "any and all claims asserted by [White] regarding Ring Power's alleged duty to download LMI data from the PAT System on the crane it rented to Miami Dade . . . prior to renting the crane to MDT." Following a hearing, the trial court granted Ring Power's motion for partial summary judgment, finding that Ring Power had no legal duty to download and review the LMI data before it rented the crane to Miami-Dade Transit.

## THE TRIAL

### a. White's Case-in-Chief

Trial began in September 2016. White's witnesses testified in pertinent part:

Harvey Ford, the track equipment operator, was operating the crane when the wire snapped. He tried several times to lift the train, moving the crane closer and at different angles, but each time alarms sounded and the crane shut down. The "scale" across the top of the crane's interior showed the crane was "maxing out." When Ford informed White, White attempted to assist him in setting up the crane. Ford tried lifting the train two more times, but each time the crane "maxed

6

out." On the last attempt, the wire cable snapped, causing the headache ball to fall, injuring White.

On cross-examination, Ford conceded that, at the time he was operating the crane, he did not know the weight of the train and he did not use the load chart to decide the best way to lift the train. Most significantly, Ford used a single-part line to lift the train. He did not know how much a single-part line could lift, and White did not suggest that Ford reconfigure the crane from a single-part line.

White also testified that he did not know how much weight they were attempting to lift on the day of the accident nor did he know "the maximum load capacity" of the crane configured with a single-part line.

Two expert witnesses testified for White: Tom Barth (a certified marine crane inspector) and Dr. Kenneth Blundell (an engineer). Barth inspected the crane and wire rope following the accident, and testified generally to the OSHA inspection requirements for cranes such as maintenance of the crane's wire cables. He also testified regarding his review of the pre-accident inspections performed on the crane in question. Barth opined that the inspectors who conducted the annual inspection of the subject crane in 2011 "did not do a very thorough job." He further opined that the wire rope broke because "[i]t wasn't well lubricated and it was abused." When Barth inspected the rope, he found it dry. Barth testified that a wire rope should be lubricated once to twice a year depending on environmental

7

conditions (e.g., weather) but that there are no specific standards requiring a rope be lubricated with a specific frequency.

Blundell testified generally about lubrication and reporting requirements for the wire rope. He opined that (1) Ring Power failed to properly inspect, maintain and lubricate the wire rope on the crane; (2) the failure to do so reduced its breaking strength; and (3) because the accident occurred only twenty-three days after Miami-Dade Transit took possession of the crane from Ring Power, Miami-Dade Transit was entitled to rely on Ring Power to properly inspect, maintain, and lubricate the wire rope prior to delivery. Blundell relied, for his opinion that the wire rope lacked lubrication, on the documentation provided to him (i.e. reports), not on a visual examination of the wire rope in question.

Eric Fidler was the product safety director for the crane manufacturer. White read excerpts of Fidler's deposition to the jury in lieu of live testimony. Fidler interpreted the crane's LMI event data recorder and testified about overloads to the crane on the day of the accident. He explained that overloads happen but they are the result of misuse of the crane. Fidler also testified about overloads occurring between August and October 2010, before Miami-Dade Transit rented the crane from Ring Power. Fidler explained that the LMI records overloads based on how the operator programmed the crane. For instance, an operator might have input that he was using a one-part line to lift a load of over 11,600 pounds but then

properly reeved[7] the crane with multiple-parts line in accordance with the weight of the load. Under this scenario, Fidler explained, the LMI would record an overload even though the crane was not physically overloaded. He described these "as overloads based on the configuration" and testified that, without knowing whether "this programming was accurately input," he could not know "whether the crane [] was actually overloaded" at the times indicated by the LMI data.

### b. Ring Power's Case-in-Chief

Ring Power then presented its case, which included in pertinent part:

Pedro Delgado, a crane mechanic with Ring Power, testified that on January 17, 2011 (about five months before the crane was rented to Miami-Dade Transit) he conducted a "thorough inspection" of the crane and spent a couple of days (a total of 14 to 15 hours) repairing and servicing the crane (e.g., electrical repairs, lubrication of the crane and wire rope). Three days later (January 20), Delgado conducted an annual inspection of the crane as required by OSHA, and again checked the lubrication.

Delgado explained that a wire rope is taken out of service if there are more than three broken wire "strings" on the cable. Delgado examined the wire rope

---

[7] To "reeve" is "to pass (something, such as a rope) through a hole or opening." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/reeve (last visited November 30, 2018). In the crane context, the amount of times the rope wraps around the sheave (or pulley) on the tip of the boom (the "big arm that goes up from the crane") is called reeving, and dictates the weight that can be lifted.

after the accident and found it was still lubricated. He also explained that, based on the number of hours used, the crane was relatively new. He did not check the crane's historical LMI data.

Michael Jarriel, a former Ring Power employee, testified generally about the crane's LMI system and the condition of the subject crane after the accident. Jarriel testified that the maximum capacity for a single-part line on the subject crane was 11,600 pounds. After the accident, the wire rope was still lubricated and some of the grease had "ooze[d]" out of the rope during the overload. According to Jarriel, the crane had only 682.6 hours of use, and the life span of a crane is approximately 25,000 hours.

Jarriel further explained that the LMI system shuts down the crane when an operator attempts to use it in an unsafe way. He noted, however, that the LMI relies on the crane operator to input the correct data. Jarriel testified that, depending on the angle of the crane's boom, the LMI can record a false overload. He tested the subject crane and another crane (the identical model and LMI system) by lifting the boom above 75 degrees. In each test, the LMI reported a false overload.

Allen Palmer, an engineer and accident investigator, testified as an expert for Ring Power regarding his examination of the crane after the accident. Palmer concluded that the primary cause of the accident "was that the crane was not

10

properly reeved to be able to lift [the] intended load"; and "[i]t didn't have enough parts of wire rope in it for the intended lift." To be able to lift 38,000 pounds (the approximate weight of the load at the time of the accident), the crane should have been reeved with a five-part line, not a single-part line. He opined that "[t]he load they were attempting to pick up was well over three times the capacity of the crane in the way it was configured at the time of the accident." This, according to Palmer, was the "primary cause of the accident."

Palmer also opined that cross-braiding of the wire rope on the drum and "improper techniques" employed to lift the train were contributing causes of the accident. He testified that: the crane should not have been used that day and should have already been taken out of service until spooled correctly and inspected for damage from the cross-braiding; Miami-Dade Transit employees were aware of the cross-braiding three days before the accident, and this should have been obvious to the crane operator on the day of the accident; and on the day of the accident, Miami-Dade Transit employees failed to heed the LMI warnings and shut down the crane. Palmer provided these opinions to Miami-Dade Transit as part of his post-accident investigation.

Palmer acknowledged that he did not examine the historical LMI data, nor did he examine the strength of the wire rope. He explained, however, that the LMI

is used to prevent tipping; it is not necessarily used in connection with the wire rope.

Eric Fidler next testified for Ring Power.[8]  Fidler testified generally to the basic components of a crane and LMI. He explained that, when the boom angle is greater than 75 degrees, the LMI will erroneously read this as an overload or a "false overload."  Fidler elaborated, explaining that while the LMI data is reliable, it must be interpreted based in part on the information programmed into it by the crane operator. He explained that a recorded overload does not necessarily mean that the wire rope is overloaded or is being damaged.

Next, Fidler testified regarding historical LMI data sheets provided to him by White's counsel during Fidler's deposition.  He explained that these data sheets did not show overloads to the wire rope. Instead, they showed pressure spikes based on the 75-degree angle of the boom.  Of the eight pages of historical overloads (372 entries) compiled from the data, Fidler explained, only twelve entries were actual overloads and eleven of those twelve overloads occurred while the crane was rented to Miami-Dade Transit.  In sum, the historical overload data,

---

[8]  After White read to the jury excerpts of Fidler's deposition, Ring Power announced its intention to call Fidler to testify live. White's counsel objected to Fidler's live testimony, contending he was presenting new opinions as a result of his "re-review of the data." The trial court permitted Fidler to testify, but precluded presentation of new opinions.

occurring before the crane was rented to Miami-Dade Transit, did not show actual overloads to the wire rope.

After the parties rested, the court held a charge conference on proposed jury instructions. Over White's objection, the trial court gave the following special jury instruction:

> The Court has found as a matter of law and instructs you that Ring Power Corporation had no duty to download LMI PAT data which may have been contained on the crane system prior to the accident in question. You may not base a finding of negligence on Ring Power Corporation on any alleged failure to download such data.

The jury returned a verdict in favor of Ring Power, finding there was no negligence on the part of Ring Power which was a legal cause of injury to White.

White moved for a new trial, which the trial court denied, and this appeal followed.

## DISCUSSION AND ANALYSIS

*1) The trial court did not abuse its discretion in excluding portions of White's experts' testimony regarding LMI data.*

White argues that the trial court abused its discretion in excluding a portion of his experts' testimony, preventing White from presenting expert testimony that previous overloads to the crane diminished the wire rope's structural integrity, causing it to snap. However, because none of these experts was qualified to interpret the LMI data or to offer opinions on the significance of this data, the trial

13

court did not abuse its discretion in excluding these portions of the experts' testimony. See Brooks v. State, 762 So. 2d 879, 892 (Fla. 2000) (holding it is "within the trial court's discretion to determine a witness's qualifications to express an opinion as an expert, and the court's determination in this regard will not be reversed absent a clear showing of error.").

"Under Frye . . . , expert opinion testimony is admissible *if the expert is qualified* and the opinion falls within the witness's expertise." Baan v. Columbia Cty., 180 So. 3d 1127, 1132 (Fla. 1st DCA 2015) (emphasis added) (citing Frye v. United States, 293 F. 1013 (D.C. Cir. 1923)). The Daubert standard requires an expert to be "*qualified . . . by knowledge, skill, experience, training, or education*" in order to testify about "scientific, technical, or other specialized knowledge." § 90.702, Fla. Stat. (2015) (emphasis added) (Florida's legislative adoption of the Daubert standard).[9]

---

[9] In 2015, at the time of the trial court's pretrial ruling on this issue, it remained an open question whether Florida courts were required to continue to follow the Frye standard or whether they should apply the Daubert standard, adopted by the Florida Legislature in 2013. See ch. 2013-107, Laws of Fla. In 2017, the Florida Supreme Court declined to adopt this statutory change to the extent it was procedural, but did not directly answer the question of whether such evidentiary determinations are substantive or procedural. See In re Amendments to Fla. Evidence Code, 210 So. 3d 1231, 1239 (Fla. 2017). During the pendency of the instant appeal, the Florida Supreme Court answered this question in Delisle v. Crane Co., 43 Fla. L. Weekly S459 (Fla. October 15, 2018), holding that section 90.702, as amended in 2013, is procedural and not substantive, and "reaffirm[ing] that Frye, not Daubert, is the appropriate test in Florida courts." Id. at *19.

14

Thus, regardless of whether the trial court ultimately applied the <u>Frye</u> or <u>Daubert</u> standard, White was required to make a threshold showing that the witness was "qualified" to render an expert opinion on the issue at hand. See <u>Chavez v. State</u>, 12 So. 3d 199, 205 (Fla. 2009) (observing that one of the preliminary determinations which must be made before admitting expert testimony is "whether the witness is adequately qualified to express an opinion on the matter").

The trial court's decision to exclude portions of White's experts' testimony was based upon a finding that these witnesses were unqualified to interpret the LMI data or offer opinions on its significance. This finding is supported by competent substantial evidence, including the experts' own deposition testimony, in which they acknowledged, for example:

- <u>Expert witness Barth</u>: He has never been trained to interpret LMI data, never took a course on LMI systems, and stated he "self-trained" regarding LMI data by reviewing the instant accident and reading depositions of other witnesses. Barth acknowledged he was not proficient in reading LMI data, and a review of the deposition establishes that Barth was unfamiliar with the LMI system and had difficulty answering basic questions about its purpose and use.

- <u>Expert witness Barbe</u>: Although he certifies crane operators, he does not certify crane maintenance workers, is not a certified crane inspector, and none of his training specifically involves wire ropes. The cranes he inspects do not use LMI systems. He did not know

15

how to download the LMI data on the crane in question, received no training on how to read LMI data, and was unfamiliar with many of the LMI codes contained in the data.

- Expert witness Mankins: He conceded to "not being an expert on LMI or this type of data"; "I wouldn't know an LMI if I saw one"; "I have no personal experience with LMI systems, nor do I profess to have any expertise associated with such a system." Mankins did not know the significance of a one-, two- or four-parts line on a crane, and acknowledged "I essentially know nothing about cranes."

None of the three experts had ever interpreted LMI data or used LMI data to investigate the cause of a crane accident or wire rope failure. Instead, all three of White's expert witnesses accepted the LMI data at face value without sufficient knowledge, training or expertise to interpret the data or opine as to its significance. We conclude that the trial court did not abuse its discretion in excluding that portion of their proposed testimony.

2) *The trial court did not err in determining that Ring Power had no legal duty to download the LMI data, and did not err in giving a special jury instruction on that issue.*

White contends the trial court erred in granting a partial summary judgment, finding as a matter of law that Ring Power had no duty to download the LMI data before delivering the crane to Miami-Dade Transit, and further contends that the trial court compounded this error by instructing the jury to this effect. We find no merit in either contention.

16

Florida Courts have explained that a party's "duty" to act "may arise from four general sources":

> (1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case.

Clay Elec. Co-op., Inc. v. Johnson, 873 So. 2d 1182, 1185 (Fla. 2003) (emphasis added); see also Limones v. Sch. Dist. of Lee Cty., 161 So. 3d 384, 389 (Fla. 2015) ("Florida law recognizes the following four sources of duty: (1) statutes or regulations; (2) common law interpretations of those statutes or regulations; (3) other sources in the common law; and (4) the general facts of the case").

Only the fourth category could apply in this case. Under this category, "the trial and appellate courts cannot find a lack of duty if a foreseeable zone of risk more likely than not was created by the defendant." McCain v. Florida Power Corp., 593 So. 2d 500, 503 (Fla. 1992); see also Limones, 161 So. 3d at 393 n. 4 ("[W]hen the duty is rooted in the fourth prong, factual inquiry into the existence of a duty is limited to whether the 'defendant's conduct foreseeably created a broader 'zone of risk' that poses a general threat of harm to others.'") (quoting McCain, 593 So. 2d at 502).

To support its argument on the existence of a legal duty, White cites to testimony from Jarriel and Delgado (two Ring Power employees) regarding their

training on LMI, and admissions that the LMI data is reliable and has in the past been reviewed following accidents. However, there is no evidence in the record to support the contention that the failure to download or review[10] the LMI historical data foreseeably created a broader "zone of risk" where (1) the crane underwent inspections after the end of each rental period; (2) on January 17, 2011, Delgado conducted a thorough inspection of the crane, including lubricating the entire length of the wire rope by hand; (3) on January 20, 2011, Delgado conducted the annually-mandated OSHA inspection, including inspecting the entire length of the wire rope for damage; (4) White's own witnesses acknowledged there are no known standards, guidelines or manuals requiring such a download; and (5) the OSHA-mandated inspection occurred approximately six months before the crane was rented to Miami-Dade Transit, consistent with OSHA guidelines (as acknowledged by White's own expert) requiring lubrication of the wire rope approximately once a year, depending on weather conditions.

We hold that the trial court properly determined Ring Power did not have a legal duty to download the LMI data before renting the crane to Miami-Dade Transit, and therefore properly granted partial summary judgment on the issue. See Sierra v. Shevin, 767 So. 2d 524, 525 (Fla. 3d DCA 2000). ("The standard of

---

[10] In fact, Ring Power would not have reviewed or interpreted the LMI data. Instead, it would have had to purchase the necessary software to access and download the LMI data and then send it to Grove USA (the crane manufacturer) for interpretation.

review of a summary judgment order is de novo and requires viewing the evidence in the light most favorable to the non-moving party"). It therefore follows that the trial court did not abuse its broad discretion in so instructing the jury. Making Ends Meet, Inc. v. Cusick, 719 So. 2d 926, 927 (Fla. 3d DCA 1998) (holding trial court did not abuse its discretion where the "instructions delivered by the court accurately reflect the law on a cause of action"). See also Font v. Union Carbide Corp., 199 So. 3d 323, 326 (Fla. 3d DCA 2016) (observing that "trial courts are accorded broad discretion in formulating jury instructions").

3) *The trial court did not abuse its discretion in denying White's motion for new trial based on opinions offered by Fidler during his trial testimony.*

White cites two changes in Fidler's opinions between his deposition and trial testimony: (1) that overloads recorded on the LMI data recorder before the date of the accident were "false overloads"; and (2) correcting his deposition testimony regarding the weight sustained by the crane and wire rope at the time of the accident. White argues these were new opinions that both surprised and unfairly prejudiced him, requiring a new trial. We do not agree.

A trial court has broad discretion to exclude witness testimony not disclosed during discovery. Binger v. King Pest Control, 401 So. 2d 1310, 1312 (Fla. 1981). "[U]ltimate control over witness disclosure problems" is left "to the broad discretion of the trial judge and focuses on prejudice in the preparation and trial of a lawsuit." Id.; see also Deutsche Bank Nat. Tr. Co. ex rel. LSF MRA Pass-

Through Tr. v. Perez, 180 So. 3d 1186, 1189 (Fla. 3d DCA 2015) ("[W]hile a trial court has the authority to exclude the testimony of an undisclosed witness, the decision to do so turns in large measure on demonstrated prejudice to the opposing party, as well as the ability to avoid any resulting prejudice and considerations relating to the orderly administration of justice").

As the Florida Supreme Court noted in Binger:

> Prejudice in this sense refers to the surprise in fact of the objecting party, and it is not dependent on the adverse nature of the testimony. Other factors which may enter into the trial court's exercise of discretion are: (i) the objecting party's ability to cure the prejudice or, similarly, his independent knowledge of the existence of the witness; (ii) the calling party's possible intentional, or bad faith, noncompliance with the pretrial order; and (iii) the possible disruption of the orderly and efficient trial of the case (or other cases). If after considering these factors, and any others that are relevant, the trial court concludes that use of the undisclosed witness will not substantially endanger the fairness of the proceeding, the pretrial order mandating disclosure should be modified and the witness should be allowed to testify.

Binger, 401 So. 2d at 1314.

The Binger analysis is to be applied where, as here, there is a claim of surprise and prejudice resulting from a change in an expert witness' opinion. Allstate Prop. & Cas. Insur. Co., 14 So. 3d 1230, 1234 (Fla. 1st DCA 2009) (holding: "The Binger analysis should be applied where a medical expert changes his or her opinion, resulting in surprise and prejudice to the opposing party and necessitating a new trial"). See also Thompson v. Wal-Mart Stores, Inc., 60 So. 3d

440 (Fla. 3d DCA 2011); Doctors Co. v. Plummer, 210 So. 3d 711 (Fla. 5th DCA 2017); Moore v. Gillett, 96 So. 3d 933 (Fla. 2d DCA 2012); Suarez-Burgos v. Morhaim, 745 So. 2d 368 (Fla. 4th DCA 1999).

Even if aspects of Fidler's live testimony could be said to constitute new or different opinions, the trial court properly denied the motion for new trial, because this testimony did not result in procedural prejudice to White.

As early as 2012, White knew of Fidler's involvement as a witness in the case, and took his deposition in January 2013, more than three years before trial. At the time of his deposition, however, he had not been designated as an expert by either party. In his deposition, Fidler testified to the LMI data recorded on the day of the accident as well as the historical LMI data recorded during prior uses of the crane. Ring Power later designated Fidler as its expert witness in July 2015, but White did not seek to re-depose Fidler following this expert witness designation.

Moreover, in August 2016 (shortly before trial) White designated Fidler _as his own expert witness_. In his required expert disclosure notice filed prior to trial, White acknowledged that Ring Power had already designated Fidler as an expert witness; that Fidler testified in deposition "about the data from the crane recorder for the date of accident"; and stated that it was anticipated Fidler would testify "at trial about his findings and conclusions after his review of the evidence about the

21

causes of the accident as it relates to the LMI data from the crane involved in this accident."

The record also establishes that Ring Power called Fidler to testify live only because White insisted on reading to the jury those portions of Fidler's testimony regarding the LMI data.

Prior to calling Fidler to testify at the trial, Ring Power proffered to White and the trial court all the questions it would ask, and even provided many of Fidler's anticipated answers. The trial court ruled that Fidler would not be allowed to offer new opinions, that he could answer questions specifically about the deposition excerpts read to the jury during White's case-in-chief, and that the testimony would cover basic "Crane 101" testimony.[11]

In addition, before Fidler testified, White was given an opportunity to further interview Fidler (which White's counsel did) and to depose Fidler (which White's counsel declined to do), concerning what White asserted were new or different opinions. See, e.g., Fonseca v. Taverna Imps., Inc., 212 So. 3d 431 (Fla. 3d DCA 2017); Klose v. Coastal Emergency Servs. of Fort Lauderdale, 673 So. 2d 81 (Fla. 4th DCA 1996). Nor did White request a continuance of the trial to cure

[11] We also note that the complained-of aspects of Fidler's testimony were consistent with, and reiterated to a large degree, the testimony already provided at trial by expert witnesses Jarriel and Palmer. In fact, Ring Power stated its intention to recall Jarriel to testify, in the event the trial court did not permit Fidler to testify live. Further, White vigorously cross-examined and challenged Fidler on what White asserts were "new" or "different" opinions.

22

any prejudice he now claims to have suffered.  See London v. Dubrovin, 165 So. 3d 30 (Fla. 3d DCA 2015); Batista v. Walter & Bernstein, 378 So. 2d 1321 (Fla. 3d DCA 1980).

We note that the trial court gave careful scrutiny to the proposed testimony of Fidler.  It weighed and considered the attendant facts and circumstances, limited the nature and scope of the testimony, and provided safeguards and opportunities to cure any potential procedural prejudice to White.  We conclude that the trial court did not abuse its discretion in permitting Fidler's testimony, nor did the trial court abuse its discretion in denying White's motion for new trial.[12]

Affirmed.

**ANY POST-OPINION MOTION MUST BE FILED WITHIN SEVEN DAYS. A RESPONSE TO THE POST-OPINION MOTION MAY BE FILED WITHIN FIVE DAYS THEREAFTER.**

---

[12] We affirm without further discussion the other issues raised by White on appeal.